[Civ. No. 16311. Third Dist. Apr. 14, 1978.]

MOUNT VERNON MEMORIAL PARK, Plaintiff and Appellant, v. BOARD OF FUNERAL DIRECTORS AND EMBALMERS, Defendant and Respondent.

**COUNSEL**

Miller, Good & Ford, James T. Ford, O'Brien & Hallisey and Charles A. O'Brien for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, and Joel S. Primes, Deputy Attorney General, for Defendant and Respondent.

**OPINION**

**PARAS, J.**—Plaintiff Mount Vernon Memorial Park, a corporation (Mount Vernon), appeals from an adverse judgment on its petition for writ of mandate. The petition was filed pursuant to Code of Civil Procedure section 1094.5 after defendant Board of Funeral Directors and Embalmers (Board), took disciplinary action against it. Such action was predicated upon Mount Vernon's violation of certain Business and

Professions Code sections relating to "preneed funeral arrangements," and the Board ordered that Mount Vernon's funeral director's license be revoked, staying its order for one year on condition that certain acts be performed to bring Mount Vernon into compliance with the relevant statutes.

On appeal, Mount Vernon contends:

(1) The Board does not have jurisdiction over its preneed funeral arrangements;

(2) the weight of the evidence requires application of the doctrine of administrative estoppel;

(3) the weight of the evidence does not establish a violation of Business and Professions Code section 7735;[1]

(4) the Board abused its discretion by imposing the probationary conditions;

(5) the Political Reform Act of 1974 bars the instant proceedings; and

(6) members of an affected industry cannot control a Board regulating that industry.

Until August 1967, Mount Vernon was licensed to act as a cemetery authority by the State Cemetery Board (Cemetery Board) and M-F-O Inc., a corporation, was licensed by the Board as a mortuary. In August 1967, M-F-O Inc. merged into Mount Vernon and the latter became a "dual licensee," i.e., a single entity licensed by both agencies (see 52 Ops.Cal.Atty.Gen. 202, 206).

In 1965, the Legislature enacted what is commonly termed the "Short Act," which added certain provisions to the Business and Professions Code and thereby placed restrictions upon preneed funeral contracts. (Stats. 1965, ch. 1414.) Section 7735 for example, precludes any licensed funeral director from entering into any such contract "unless said contract requires that all money paid . . . shall be held in trust for the purpose for which it was paid or delivered until the contract is fulfilled

---

[1]Section references henceforth are to the Business and Professions Code, unless otherwise indicated.

. . . ." It further provides that the *income* resulting from the trust corpus may be utilized to pay for expenses of administering the trust, a trustee's fee not to exceed $25, sales expenses, and a cancellation fee. It further specifically provides that the trust corpus and trustee's fee may not be used for payment of sales commissions. Section 7736 defines the words "corpus of the trust" to include "all monies paid and securities delivered pursuant to the provisions of the article . . . ." Section 7737 provides that all money received for deposit into trust must be so placed within 30 days.

Section 7738 recognizes the unique status of dual licensees as follows: "(a) Nothing in this article shall prevent a licensed funeral director who is also a licensed cemetery authority from depositing any money or securities received in connection with preneed funeral arrangements in a special endowment care fund as provided in Article 4 (commencing with Section 8775), Chapter 5, Part 3, Division 8 of the Health and Safety Code and the rules and regulations adopted pursuant thereto by the State Cemetery Board, provided that *none of the trust corpus shall be used for payment of any commission or other expenses of trust administration.*" (Italics added.)

Health and Safety Code section 8775 et seq. provides for the establishment of "special care trusts" by cemetery authorities. Pursuant thereto, regulations which became effective in 1960 provide for placing monies received by a cemetery authority pursuant to a preneed contract into trust. Title 16, section 2370 of the California Administrative Code provides: "Special trusts. Trusts established pursuant to section 8775 of the Health and Safety Code to provide for funeral services, cremation, or other commodities or services furnished at the time of and in connection with such funeral or cremation are under the supervision of the State Cemetery Board and must comply with the following requirements: [¶] (a) Any money paid or to be paid by the trustor to the cemetery authority or any other person as commission, . . . shall be separately and specifically set forth in the agreement. The amount remaining after deduction of trust or other expenses as separately stated, is hereinafter referred to as 'trust corpus.' "

In 1965, M-F-O Inc.'s preneed funeral contracts contained a clause stating: "The first $_____ paid by Purchaser under the agreement shall be used for commissions, accounting, administrative and trustee's expenses and the balance of $_____, when received, shall be held by

the Trustees as the 'Trust Corpus.'" Pursuant to this clause, 35 percent of the purchase price was paid to a sales person as commission. The portion of the total contract price which was "trust corpus" was not placed into trust until all installment payments were made; until then, as payments were received, they were placed by M-F-O Inc. into its general commercial account. In 1967, M-F-O Inc. raised its sales commission to 40 percent, and as part of its 1967 preneed funeral fund report, filed with the Board a notation that 60 percent of each dollar would be placed into a special care fund.

Upon the cancellation of a preneed funeral service agreement, M-F-O Inc., and later Mount Vernon, would not refund money but would issue a "letter of credit" for 40 perent of the monies paid in. Mount Vernon discontinued the further use of 40-60 contracts in October 1969 when the Cemetery Board specifically directed that 100 percent of funds received must be placed in trust; but payments made thereafter on existing preneed 40-60 contracts were handled as before.

In 1967, the Board's then executive secretary Leroy Perrin discussed the continued use of 40-60 contracts with Mount Vernon and M-F-O Inc. He told them that the only way in which the Short Act provisions could be utilized was if the licenses were held by the *same entity.* As above stated, the corporations were therefore merged, and all contracts were rewritten. It was represented in writing that each preneed contract dated before August 10, 1967, which the customer would cancel rather than reaffirm would result in a 100 percent refund to him. Foy Bryant, Mount Vernon's president, denied that Perrin told him at that meeting or any other thereafter to put all monies received, including the 40 percent, in trust.

Perrin died in May 1969 and was replaced by David Buck, who had been a field representative of the Board since May 1967. Buck testified that during his tenure Perrin had taken the position that the Short Act's restrictions applied to dual licensees, and that while they were permitted by section 7738 to deposit their money into the special endowment care fund, that was the only "privilege" granted by the statute. Memoranda had been circulated to all licensees to that effect.

When Buck became executive secretary, he updated the earlier memo and circulated it again to all licensees. An Attorney General's opinion (the Hamilton Opinion, 52 Ops.Cal.Atty.Gen. 202), which according to Buck explained the Board's position, was incorporated therein. The

opinion stated in part as follows: ". . . a preneed funeral contract entered into by a licensed funeral director who is also a licensed cemetery authority must comply with the provisions of Article 9 of the Funeral Directors and Embalmers Law [Bus. & Prof. Code, § 7735 et seq.] with the exception that any money or securities received in connection therewith may be deposited in its special endowment care funds." (52 Ops.Cal.Atty.Gen. at p. 207.)

At the time of his appointment, Buck was unaware that Mount Vernon was using 40-60 contracts. He conceded that copies of Mount Vernon's preneed agreement had been filed with the Funeral Board, but noted that the mere existence of the 40-60 provisions therein did not put him on notice that Mount Vernon was not complying with the law. Buck asserted that he first was apprised that Mount Vernon was not placing preneed monies into trust upon review of a field inspection report in November 1971. On that form appeared a notation "All money collected of prior 10/1/69 pre need accts is not placed in trust until all funds on each PN sale is collected." The Board's field representative and Buck then made several trips to Mount Vernon's office to ascertain the manner in which preneed trust funds were handled. Buck was told that the funds designated in Mount Vernon's records as "40% money" went for payment of commissions and sale expenses; he was also informed that not all of the remaining "60% money" was actually in trust, because it was not so placed until completion of all contract payments.

The records of Mount Vernon disclosed a total sales figure for all 40-60 contracts from 1965 to 1969 of $3,228,590.10. The total amount of monies collected was $1,555,127. "40% money" paid in was $1,116,183.05. "60% money" totalled $438,943.95, of which only $132,289.88 was in trust.

Subsequent meetings were held between Buck and Mount Vernon's representatives. Thereafter informal Board proceedings were commenced. Eleven specific complaint areas were specified. Two informal hearings were held, and following the Board's executive session, its attorney was instructed to proceed with the formal accusation.

Facts were elicited at the administrative hearing to substantiate several counts in the accusation relating to Mount Vernon's handling of specific preneed contracts with various persons. These persons were Georgia Kay Ferrari (count I), Bob J. Ferrari (count II), Virgie I. Shrum (count III),

Marian E. Hays[2] (count IV), Lorin C. Hayes (count V), and Marguerite E. Aymar (count VI). The accusation alleged that the contracts entered into with these persons did not comply with the Short Act, because they did not provide that the contract money would be placed in trust and would be returned upon written request and revocation of the agreement; also that Mount Vernon in fact refused to refund money previously paid pursuant to the contracts upon written request therefor.

The evidence established that Mount Vernon used the same 40-60 form contract with each such person. Each revoked the agreement and wrote to Mount Vernon requesting a cash refund of all monies paid. Instead of money, they were given "letters of credit" in varying amounts, which were "for credit on the purchase of any memorial property or funeral arrangement at: 'Mount Vernon Memorial Park-Mortuary . . . .'" In several instances, Mount Vernon finally made partial cash refunds after it was put on notice of possible disciplinary proceedings.

A proposed decision was filed by the hearing officer and adopted by the Board. Specific findings of fact were made as to counts I, II, III, V, and VI, substantially in accordance with the above summarized evidence.

Count VII charged Mount Vernon with repeated failure to deposit the first 40 percent received on its preneed funeral contracts executed between December 1965 and October 1969, in violation of sections 7735 and 7737, such violations occurring upon receipt of each installment payment. The Board sustained this accusation. Count VIII charged Mount Vernon with repeated failure to deposit in trust amounts received pursuant to preneed funeral contracts until the entire contract price had been paid, in violation of section 7737, which violations occurred upon receipt of each installment payment. The Board sustained this count. In its ninth count, Mount Vernon was accused of violating section 7738 in that funds received pursuant to preneed funeral contracts repeatedly were not deposited in the endowment care fund, which violations occurred upon receipt of each installment. The Board sustained this accusation.

Each of these Board findings was found supported by the weight of the evidence by the trial court.

---

[2]The Board's decision found that there were no facts to establish that Mount Vernon and Marian E. Hays had entered into a preneed contract.

The Board ordered that for each of the counts sustained by findings, Mount Vernon's funeral director's license would be revoked, subject to a one-year stay conditioned upon compliance with certain directions:

(1) full compliance with all laws and regulations;

(2) redemption in cash of all existing letters of credit;

(3) preparation of a written list of holders of letters of credit and written notice furnished to all such persons that cash redemption is available;

(4) preparation of a list of persons holding existing 40-60 preneed contracts, such list to be provided to the Board;

(5) immediate placement of all 40 percent and 60 percent monies received by Mount Vernon on preneed funeral contracts in trust;

(6) reports to the Board setting out compliance with the conditions upon which the stay is predicated.

Mount Vernon does not deny or attack the existence of the facts summarized above. It does, however, attack general findings of fact to the effect that: (1) neither the Board nor any official thereof authorized Mount Vernon to use 40-60 contracts, (2) the evidence does not establish a factual basis for estoppel, and (3) at the date of hearing there remained 60 percent monies received by Mount Vernon on preneed funeral contracts which had not yet been placed into trust.

I

Mount Vernon contends that the legislative intent as expressed in section 7738 is to have the preneed funeral contracts of dual licensees regulated solely by the Cemetery Board.

The interpretation of a statute, when the facts are agreed upon, is a question of law. (*People* ex rel. *Dept. Pub. Wks.* v. *County of Santa Clara* (1969) 275 Cal.App.2d 372, 375 [79 Cal.Rptr. 787].) The function of the court is to ascertain the intent of the Legislature in order to effectuate the law's purpose. (*Mercer* v. *Perez* (1968) 68 Cal.2d 104, 112 [65 Cal.Rptr. 315, 436 P.2d 315]; *People* v. *Superior Court* (1969) 70 Cal.2d

123, 132 [74 Cal.Rptr. 294, 449 P.2d 230]; Code Civ. Proc., § 1859.) A court may not, under the guise of construction, rewrite a statute (*Subsequent Injuries Fund* v. *Industrial Acc. Com.* (1963) 217 Cal.App.2d 322, 331 [31 Cal.Rptr. 508]); and within the framework of the language used, the court should interpret a statute to make it workable and reasonable. (*Harris* v. *Alcoholic Bev. etc. Appeals Bd.* (1961) 197 Cal.App.2d 759, 763 [18 Cal.Rptr. 151]; *People* v. *Superior Court, supra,* 70 Cal.2d at pp. 132-133.) The result of construction must be reasonable and consistent with the legislative purpose. (*Cal Pacific Collections, Inc.* v. *Powers* (1969) 70 Cal.2d 135, 140 [74 Cal.Rptr. 289, 449 P.2d 225].)

The Short Act sets out an elaborate plan for the control of funds accruing under preneed funeral contracts. Its obvious purpose is to recognize the utility of a prepaid funeral arrangement and at the same time assure its performance by requiring that all consideration paid pursuant thereto be held in trust until the need materializes. "While such a requirement may seem harsh to some it has been observed that the anticipated passage of time between execution of the agreement and performance establishes a fertile field for fraud, deceit and imposition with the ensuing solvency imminent. [Fn. omitted.] [Citations.] The Legislature has determined that the public interest in securing performance of prepaid funerals was greatly endangered by the large sums attributed to sales expenses and commissions. . . . [P]rior to 1965, 15% to 30% of the funds collected by some California licensees was allocated to sales expenses." (Hamilton Opn., 52 Ops.Cal.Atty.Gen., *supra* at p. 204.)[3]

At all pertinent times, section 7736 specifically defined the term "corpus of the trust" to include "all monies paid and securities delivered pursuant to the provisions of the article *other than the amount paid as a trustee's fee.*" (Italics in original.) Section 7738 made it clear that the corpus may not be used to pay commissions *or other trust expenses,* leaving as its only advantage to a dual licensee the ability to utilize an existing trust fund and not establish and maintain a second one. "Thus the purpose of section 7738 was to clarify that a licensed cemetery authority need not establish a separate trust for preneed funeral arrangement funds and, where the funeral director elects to deposit said preneed funds in its special endowment care fund, to resolve the conflict

---

[3]For examples of possible abuses of preneed monies, see Hamilton opinion (52 Ops.Cal.Atty.Gen. 202, 204, fn. 2).

between which law should apply in regard to permissible trustees and types of investments." (52 Ops.Cal.Atty.Gen., *supra* at p. 207.)[4]

■ The construction urged by Mount Vernon would have this court ignore the definition of trust corpus set out above, and apply instead the definition of trust corpus employed in California Administrative Code, title 16, section 2370. This would completely frustrate the legislative intention (to require the entrustment of *all* proceeds paid pursuant to preneed funeral contracts) in instances wherein the contracting funeral director happens to be a dual licensee. We cannot conceive that the Legislature would seek to prohibit potential abuses of preneed funeral contracts by mortuaries generally, yet tolerate them by mortuaries which are also cemetery authorities. No legitimate legislative purpose is served by exempting dual licensees from requirements pertaining to the form of the preneed contract (§ 7735), the duty to place contract proceeds in trust within 30 days of receipt (§ 7737), the restriction that none of the proceeds received be used for sales and other expenses (§ 7735), and the requirement that the agreement be revocable and the proceeds derived thereunder refundable (§ 7735). Such an exemption would bestow upon a small class of funeral directors an opportunity to perpetrate the very abuses which spawned the Short Act.

## II

■ "It is settled that '[t]he doctrine of equitable estoppel may be applied against the government where justice and right require it. [Citations.]' Correlative to this general rule, however, is the well-established proposition that an estoppel will not be applied against the government if to do so would effectively nullify 'a strong rule of policy, adopted for the benefit of the public, . . .' [Citation.]" (*City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 493 [91 Cal.Rptr. 23, 476 P.2d 423].)

"The government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite to such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon

---

[4]Mount Vernon argues that the 1969 Hamilton opinion reversed the position taken by the Attorney General in a 1965 opinion, 47 Ops. Cal. Atty. Gen. 91. We find no inconsistency between the two.

public interest or policy which would result from the raising of an estoppel." (*Id.,* at pp. 496-497; *People* v. *Department of Housing & Community Dev.* (1975) 45 Cal.App.3d 185, 196-197 [119 Cal.Rptr. 266].)

The elements of estoppel are: "(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." (*Driscoll* v. *City of Los Angeles* (1967) 67 Cal.2d 297, 305 [61 Cal.Rptr. 661, 431 P.2d 245]; *City of Long Beach* v. *Mansell, supra,* 3 Cal.3d at p. 489.)

The trial court, and the Board, found that neither the Board nor its agents authorized Mount Vernon to utilize 40-60 contracts or preneed monies for other than the purposes provided in the Short Act. Further, both the Board and the superior court found no factual basis for estoppel. Thus, Mount Vernon is essentially arguing that the evidence does not support the finding of the trier of fact.

The trial court appropriately employed the independent judgment test; thus it reviewed the evidence presented at the administrative hearing to determine if the agency's findings were supported by the weight of the evidence. (See *Bixby* v. *Pierno* (1971) 4 Cal.3d 130 [93 Cal.Rptr. 234, 481 P.2d 242].) The question before an appellate court in such a case is whether the trial court's findings are supported by substantial evidence. The judgment will be affirmed if there is substantial evidence to support each essential trial court finding. (*Moran* v. *Board of Medical Examiners* (1948) 32 Cal.2d 301, 308 [196 P.2d 20]; see generally Deering, Cal. Administrative Mandamus (Cont.Ed.Bar 1967) §§ 5.71, 15.25, pp. 82-83, 280-281.)

The evidence in this administrative record is subject to conflicting inferences. However, as above summarized, it provides evidentiary support for the trial court's conclusion that a factual basis for estoppel is absent. First, we are not convinced that the Board's officers were actually aware that Mount Vernon was not following the Short Act. Insofar as Perrin's advice to Mount Vernon and M-F-O Inc. to merge in order to take advantage of prerogatives available to a dual licensee, the evidence is susceptible of the construction that he conceived this prerogative as limited to utilization of a preexisting trust vehicle. Thus, the record

supports an implied finding that the first element of estoppel referred to above is not present. Second, even assuming the presence of all the elements of estoppel, the strong public policy behind the Short Act, as above articulated, compels eschewal of the estoppel doctrine.[5] (See *Martin* v. *Alcoholic Bev. etc. Appeals Bd.* (1959) 52 Cal.2d 287, 292-293 [341 P.2d 296]; *Joseph George, Distr.* v. *Dept. of Alc. Control* (1957) 149 Cal.App.2d 702, 713 [308 P.2d 773].)

## III

Mount Vernon's third contention in effect is an argument that the one year statute of limitations (§ 7686.5) applies as a matter of law to counts I to VII inclusive. The argument assumes and presupposes that the Board found Mount Vernon guilty only of a violation of section 7735; in fact violations of sections 7735 through 7738 were found, and the argument fails. No further discussion is necessary.

## IV

■ Mount Vernon contends that the Board, by requiring as a condition to its stay of license revocation that Mount Vernon presently fund the trust with an amount equal to all contract money received by it, irrespective of date, is attempting to do indirectly what it cannot do directly. This contention is premised on the assumption that because the statute of limitations (§ 7686.5) precludes the Board from using outlawed transactions as the basis for disciplinary action, it cannot require, in the course of imposing discipline, that illegalities associated therewith be corrected. There is no such rule of law. ■ "[I]n reviewing the penalty imposed by an administrative body which is duly constituted to announce and enforce such penalties, neither a trial court nor an appellate court is free to substitute its own discretion as to the matter; nor can the reviewing court interfere with the imposition of a penalty by an administrative tribunal because in the court's own evaluation of the circumstances the penalty appears to be too harsh. [Citation.] Such interference ... will only be sanctioned when there is an arbitrary,

---

[5]Moreover, the facts here do not raise an inference that Mount Vernon was disadvantaged by such supposed Board conduct, as were the hapless property owners in *City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462 [91 Cal.Rptr. 23, 476 P.2d 423], or in *People* v. *Department of Housing & Community Dev.* (1975) 45 Cal.App.3d 185 [119 Cal.Rptr. 266]. Our frank impression is that Mount Vernon saw in section 7738 an opportunity to "split hairs," and try to avoid the otherwise clear intendment of the law. It took its chances and can only blame itself for its folly.

capricious or patently abusive exercise of discretion." (*Brown* v. *Gordon* (1966) 240 Cal.App.2d 659, 667 [49 Cal.Rptr. 901]; *Cadilla* v. *Board of Medical Examiners* (1972) 26 Cal.App.3d 961, 966 [103 Cal.Rptr. 455].)

■ The probationary terms imposed herein do not constitute an abuse of discretion. The Board has unearthed a long-standing practice of Mount ·Vernon calculated to avoid the conditions of the Short Act. Mount Vernon has enjoyed the use of monies which it should have entrusted immediately upon receipt. Thus, the protection for purchasers of preneed funeral contracts envisioned by the Short Act has not been forthcoming to persons contracting with Mount Vernon. Mount Vernon will not be unduly disadvantaged by now placing into trust monies which it should have entrusted originally; on the contrary, it has benefited by the protracted use of and the interest on such monies, the value of which it has not been required to disgorge.

V

■ Mount Vernon raises for the first time on appeal a contention that the Political Reform Act of 1974 (Gov. Code, § 81000 et seq.) bars the instant proceeding in that five members of the Board (out of eight) are licentiates of the Board, and thus have a pecuniary interest in its decision. Government Code section 87103 defines instances wherein an official has a financial interest in a decision within the meaning of the act. They occur when it is reasonably foreseeable that the decision will have a material financial effect, distinguishable from its effect on the public generally, on business entities, real property, or sources of income which the official owns or in which he has an interest.

The Political Reform Act of 1974 does not negate the instant disciplinary proceeding. It is difficult to perceive how any of the Board members who are also licentiates were "affected" within the meaning of the act by their decision, Mount Vernon's assertion to the contrary notwithstanding. (See *American Motors Sales Corp.* v. *New Motor Vehicle Bd.* (1977) 69 Cal.App.3d 983, 990-991 [138 Cal.Rptr. 594].)

VI

Section 7601 provides for an eight-person board, five of whom shall be licentiates of the Board, and three of whom shall be public members.[6]

---

[6]Section 7601 was amended in 1976 to reduce to three the number of required licentiates.

Mount Vernon points to this composition and argues therefrom that the rule established by the California Supreme Court in *State Board* v. *Thrift-D-Lux Cleaners* (1953) 40 Cal.2d 436 [254 P.2d 29], is violated. Mount Vernon misapprehends the *Thrift-D-Lux* holding. In *Thrift-D-Lux,* a Dry Cleaners Act of 1945 established a seven-member State Board of Dry Cleaners. The board's principal duty was to establish and regulate minimum price schedules. Six of the seven board members were in the dry cleaning industry.

The Supreme Court held: "While the delegation of governmental authority to an administrative body is proper in some instances, the delegation of absolute legislative discretion is not. To avoid such a result it is necessary that a delegating statute establish an ascertainable standard to guide the administrative body. Here the statute assumes to confer legislative authority upon those who are directly interested in the operation of the regulatory rule and its penal provisions with no guide for the exercise of the delegated authority. The board is made up of six active members of the industry, and one member of the public at large. . . . '. . . one person may not be entrusted with the power to regulate the business of another, and especially of a competitor. And a statute which attempts to confer such power undertakes an intolerable and unconstitutional interference with personal liberty and private property.' " (40 Cal.2d at p. 448.)

Subsequent cases utilizing the *Thrift-D-Lux* ruling have emphasized that one's rights are abridged only when a delegating statute sets no ascertainable standard to guide the administrative body. (See *Blumenthal* v. *Board of Medical Examiners* (1962) 57 Cal.2d 228, 235 [18 Cal.Rptr. 501, 368 P.2d 101]; *Southern Pac. Transportation Co.* v. *Public Utilities Com.* (1976) 18 Cal.3d 308, 313 [134 Cal.Rptr. 189, 556 P.2d 289]; *Stoddard* v. *Edelman* (1970) 4 Cal.App.3d 544, 548 [84 Cal.Rptr. 443]; *Clean Air Constituency* v. *California State Air Resources Bd.* (1974) 11 Cal.3d 801, 816-817 [114 Cal.Rptr. 577, 523 P.2d 617]; *Antoine* v. *Department of Public Health* (1973) 33 Cal.App.3d 215, 227-228 [108 Cal.Rptr. 689].) Such is not the case here. Mount Vernon does not and cannot argue that the grant of governmental power to the Board in the instant case is without "directives of conduct for the administrative body in exercising its delegated administrative or regulatory powers." (*Duskin* v. *State Board of Dry Cleaners* (1962) 58 Cal.2d 155, 159-161 [23

Cal.Rptr. 404, 373 P.2d 468]; see also *American Motors Sales Corp.* v. *New Motor Vehicle Bd., supra.*)

The judgment is affirmed.

Puglia, P. J., and.Evans, J., concurred.

A petition for a rehearing was denied May 8, 1978, and appellant's petition for a hearing by the Supreme Court was denied June 15, 1978. Bird, C. J., and Manuel, J., did not participate therein.