[Civ. No. 20927. Third Dist. Oct. 5, 1982.]

AMERICAN FUNERAL CONCEPTS-AMERICAN CREMATION
SOCIETY et al., Plaintiffs and Appellants, v.
BOARD OF FUNERAL DIRECTORS AND EMBALMERS,
Defendant and Appellant.

304

COUNSEL

Greve, Clifford, Diepenbrock & Paras, Anthony C. Diepenbrock and Craig T. Weeks for Plaintiffs and Appellants.

Turner & Sullivan and Richard H. Ongerth as Amici Curiae on behalf of Plaintiffs and Appellants.

George Deukmejian, Attorney General, and Joel S. Primes, Deputy Attorney General, for Defendant and Respondent.

---

OPINION

BLEASE, J.—Daniel S. Summers was a licensed funeral director doing business as American Funeral Concepts-American Cremation Society. The Board of Funeral Directors and Embalmers instituted disciplinary proceedings against him. Summers was charged with failure to deposit in trust proceeds from preneed funeral contracts (see Bus. & Prof. Code, § 7735)[1] and doing business as a funeral director at unlicensed premises (see § 7628). After a hearing the board revoked Summers' license. He unsuccessfully petitioned for relief in the trial court. He appeals the judgment denying his petition. We will reverse the judgment, for failure of the board to make proper findings supporting disciplinary action, with directions permitting the board to make new findings on the present record.

### Facts

In 1976 Summers applied for a funeral director's license. He received an oral examination by the board. At the examination he explained he intended to conduct his business by collecting a membership fee to arrange for funeral-related services to be conducted in the future. On August 17, 1976, he was issued a license and went into business.

One component of his business was arranging for currently needed funeral services, e.g., embalming and burial or cremation. The other was contracting to provide fixed-price funeral services in the future. It is the latter component, the so-called preneed contracting, that led to this dispute.

The preneed contract contained two parts. The first was called, inter alia, the basic service contract and the American Memorial Society

---

[1]All statutory references hereafter are to the Business and Professions Code unless noted.

membership agreement. It was paid for by a basic service charge or membership fee. This purchased the filling out and filing of forms, a membership card, and the right to obtain a preneed agreement for a fixed-price funeral. The second part was the preneed funeral agreement. Here, the customer exchanged a promise to pay a fixed price for Summers' guarantee to provide future funeral services at that price.

Initially, the basic service charge (or membership fee) was $15 for a single person and $25 for a couple. It steadily mounted to $50, $100, $200 and $250 per customer. In January of 1978 someone mailed copies of the forms used by Summers for preneed contracting to a board auditor. The auditor went to Summers' establishment and inquired about the disposition of the proceeds of the basic service contracts. He was informed the money was used for sales expenses and administrative expenses. Thereafter, a protracted series of communications between board staff and Summers and his attorney ensued concerning the compliance of the preneed contracting scheme with section 7735.

While this dialogue was being conducted Summers organized the American Memorial Society (AMS). AMS was incorporated in October of 1978. Summers and his wife were the sole shareholders. AMS became the vehicle for the membership part of the preneed contracting. AMS opened new offices at another location in Sacramento and also in Stockton. The January 1979 Sacramento phone book listed the Sacramento AMS office under the funeral director heading in the yellow pages. The American Cremation Society was separately listed at the same address as the AMS office.

The board served Summers with an accusation in October of 1978 seeking to suspend or revoke his license as a funeral director. A supplemental accusation was served in May of 1979. It alleged Summers was liable for discipline on two grounds. He was charged with unprofessional conduct for failing to place the service charges and membership fees in trust. He also was charged with violating sections 7718.5, 7693, 7617, 7623 and 7628 because he advertised AMS as a funeral director in the yellow pages, held AMS out as a funeral director, and listed the AMS address as the place of business of the American Cremation Society.

After a hearing, the board, on December 7, 1979, issued a written decision. It found (1) Summers had conducted his operation by means of

two distinct agreements, one for membership, the other for cremation; (2) he used the proceeds of the basic service contracts to pay administrative expenses and commissions to salesmen; (3) the basic service contract listed seven items which (4) are not actions immediately required to be performed upon signing the agreement; (5) use of the proceeds constituted fraud with respect to the members; (6) Summers incorporated AMS which (7) was not licensed by the board; (8) AMS was listed as a funeral director in the yellow pages at a location not licensed by the board; (9) Summers did not report basic service contract funds to the board; (10) he did not report on advice of his attorney.

The board further made a determination of issues: "[¶] I Evidence establishes that respondent violated Section 7735 of the Business and Professions Code. Respondent received money from persons for services not immediately required. Respondent did not place such funds in a trust account but used such funds to pay commissions and ordinary expenses of the business. Such acts are grounds for discipline. [¶] II Evidence establishes further grounds for discipline pursuant to Sections 7692, 7703, 7707, 7737, 7738, subdivision (b), 7739 and 7740, Business and Professions Code, and Sections 1267, 1269, subdivision (a) and (d), 1270, 1272 and 1273 of Title 16, California Administrative Code. [¶] III Evidence additionally establishes violations of Sections 7718.5, 7693, 7617, 7623 and 7628, Business and Professions Code."

Summers' license was conditionally revoked and made subject to a 300-day suspension if he made restitution of the proceeds received after November 1, 1977, from the basic service contracts, reported the disputed transactions and submitted to an audit, and filed a current financial statement. The order of revocation recites that it is predicated on two separate grounds: (1) violation of section 7735 and (2) the remaining causes of discipline found and determined.

I

Summers contends the board erred in revoking his license for violation of section 7735. He argues the evidence does not support the conclusion his activities violated the statute and does not support the board finding the membership services were "not immediately required," as that phrase is used in the statute, and that no other finding supports a violation of section 7735. We find merit in his arguments.[2]

---

[2]Summers also argues the board is estopped to impose discipline because he revealed his proposed modus operandi without objection during the application process. Howev-

Review of the board's action is governed by Code of Civil Procedure section 1094.5. It provides: "The inquiry in such a case shall extend to the questions whether [the board] has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b).)

■ *Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506 [113 Cal.Rptr. 836, 522 P.2d 12] teaches that administrative findings set forth solely in the language of the applicable legislation are insufficient. (*Id.*, fn. 16, p. 517.) To pass muster findings must reveal the line(s) of factual and legal conclusions upon which the board relies.[3] (*Ibid.*)

■ The only elaboration of the bare conclusion that Summers' conduct violated section 7735 is provided by the finding that the membership services were "not immediately required." (See section I of the board's determination of issues, *supra.*) The clear import of this

er, he did not raise this issue in the trial court as required. (See generally 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 944, pp. 2524-2525.) Failure to raise the issue in the trial court bars it from being considered on appeal. (See *Corcoran* v. *S.F. etc. Retirement System* (1952) 114 Cal.App.2d 738, 745 [251 P.2d 59]; *Amluxen* v. *Regents of University of California* (1975) 53 Cal.App.3d 27, 36 [125 Cal.Rptr. 497]; see generally 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, §§ 266-288.) Second, the evidence is insufficient to substantiate the claim. The board could not know Summers would raise the membership charge far above the arguably nominal $15 to $25 level. Moreover, Summers continued his challenged behavior long after he was notified by the board staff of its opinion his practice violated section 7735. Finally, this is an inappropriate context for application of estoppel doctrine. (*Mount Vernon Memorial Park* v. *Board of Funeral Directors & Embalmers* (1978) 79 Cal.App.3d 874, 888 [145 Cal.Rptr. 275].)

[3]*Topanga*'s enumeration of the purposes served by findings is noteworthy: "Among other functions, a findings requirement serves to conduce the administrative body to draw legally relevant sub-conclusions supportive of its ultimate decision; the intended effect is to facilitate orderly analysis and minimize the likelihood that the agency will randomly leap from evidence to conclusions. [Citations.] In addition, findings enable the reviewing court to trace and examine the agency's mode of analysis. [Citations.] [¶] Absent such roadsigns, a reviewing court would be forced into unguided and resource-consuming explorations; it would have to grope through the record to determine whether some combination of credible evidentiary items which supported some line of factual and legal conclusions supported the ultimate order or decision of the agency. . . . Moreover, properly constituted findings enable the parties to the agency proceeding to determine whether and on what basis they should seek review. [Citations.] They also serve a public relations function by helping to persuade the parties that administrative decision-making is careful, reasoned, and equitable." (*Id.*, at pp. 516-517, fns. omitted.)

finding is that membership services are "services, property or merchandise not immediately required" as that phrase is used in section 7735. This conclusion is untenable.

The antecedent to which the quoted phrase refers is "the final disposition of a dead human body or for funeral services or for the furnishing of personal property or funeral merchandise."[4] The membership services offered by Summers do not fall within this phrase. The activity proscribed is contracting in the present to provide funeral goods or services in the future. The requirement that preneed contract moneys be placed in trust is imposed so that the money paid for future provision of goods and services cannot be dissipated prior to the time the need for them accrues. That logic does not apply to goods or services actually delivered at the time of the contract.[5]

If all Summers did was to provide the services listed in the basic services contract at the time of contracting, he did not violate section 7735. They are present services concerning the future: the preparation of information and authorization forms directing the final disposition of the body.[6] While some of these services involve future action, i.e., the continued maintenance of the forms, they do not fall within the ambit of 7735. They are not "funeral services."

---

[4]Section 7735 provides: "No funeral director licensed under the laws of the State of California, his agents or employees, shall enter into or solicit any preneed arrangement, contract or plan, hereinafter referred to as 'contract,' requiring the payment to said licensee of money or the delivery to him of securities to pay for *the final disposition of a dead human body or for funeral services or for the furnishing of personal property or funeral merchandise, wherein the use or delivery of said services, property or merchandise is not immediately* required, unless said contract requires that all money paid directly or indirectly and all securities delivered under such agreement or under any agreement collateral thereto, shall be held in trust for the purpose for which it was paid or delivered until the contract is fulfilled according to its terms; provided, however, that any payment made or securities deposited pursuant to this article shall be released upon the death of the person for whose benefit such trust was established as provided in Section 7737. The income from the corpus may be utilized to pay for a reasonable annual fee for administering the trust, including a trustee fee, to be determined by the board, and to establish a reserve of not to exceed 10 percent of the corpus as a revocation fee in the event of cancellation on the part of the beneficiary. [¶] None of the trust corpus shall be used for payment of any commission nor shall any of the trust corpus be used for other expenses of trust administration." [Italics added.]

[5]Compare section 7741, "Nothing in this article shall apply to cemetery property; cemetery commodities; cemetery service; or merchandise that is delivered as soon as paid for."

[6]The text of the basic service contract provision describing these services is: "Basic service charge provides the following services: [¶] 1. Obtain the Removal Permit. This

## II

The trial court sought to fill the breach by supplying its own finding. It concluded the evidence demonstrates the agreement by Summers to provide fixed-price funeral services is *collateral* to the basic service contract, an alternate ground of violation of section 7735, which was charged by the agency but not made a basis for discipline. (See section III, *ante.*) However, the court cannot cure the agency's improper finding. (See generally Deering, Cal. Administrative Mandamus (Cont.Ed.Bar 1966) §§ 5.43-5.49.) To permit such a post hoc cure would make unattainable the goals of findings elaborated in *Topanga, supra*, 11 Cal.3d 506.

The trial court "is without power to substitute its discretion for that of the board in the matter of the form of discipline to be imposed." (*King* v. *Board of Medical Examiners* (1944) 65 Cal.App.2d 644, 652 [151 P.2d 282].) To do so would interfere with discretion vested in the agency. (See Code Civ. Proc., § 1094.5, subd. (f).) This consideration precludes the court from cutting and pasting its premise upon an agency determination founded on a different premise. The agency decision to discipline Summers and the choice of the discipline may have been influenced by the erroneous finding.

For these reasons we will direct that the case be returned to the agency for proper consideration.[7]

---

is kept on file and is used to promptly remove the body from its location. [¶] 2. Obtain the Authority to Cremate. This document is utilized in authorizing the actual cremation. [¶] 3. Obtain the Vital Statistic Information Sheet. This form is utilized to complete necessary permits and certificates with the County Health Department. [¶] 4. Obtain the Permit for Disposition. This form is maintained on record to allow for desired disposition at the time of death. [¶] 5. A guarantee to the consumer of complete cremation and/or traditional services as per their instructions or per the Guaranteed Funeral Contract when obtained. [¶] 6. Twenty-four hour counseling staff on duty. [¶] 7. A lifetime membership in AFC-ACS.[*]"

[7]Nor does the trial court's scope of review alter the necessity of proper *board* findings. (See *Hadley* v. *City of Ontario* (1974) 43 Cal.App.3d 121, 129 [117 Cal.Rptr. 513].) Trial court review of the board decision is conducted pursuant to the independent judgment standard. (*Drummey* v. *State Board of Funeral Directors* (1939) 13 Cal.2d 75 [87 P.2d 848].) However, this exercise of independent judgment applies only to the evaluation of the evidence to determine if it supports the findings, not to the findings themselves. (Code Civ. Proc., § 1094.5, subd. (c); see generally Cal. Administrative Mandamus, *supra*, § 5.74.)

---

*This provision is an apparent pleonasm.

## III

Summers was alternately charged in the administrative pleadings with a "violation of Section 7735 in that "[m]oney" paid to [him] on agreements, *collateral to* the cremation agreement, are used for sales expenses" and not placed in trust. (Italics added.) Section 7735 requires that money received from an "agreement collateral" to a preneed funeral agreement must also be placed in trust. The board hearing was tried in part on this theory. However, as related earlier, the only finding amplifying the conclusion that Summers violated Section 7735 is that membership services are "not immediately required." No finding is reasonably susceptible of the inference that the basis for the board action was a determination that the contracts are collateral.[8]

Nevertheless, the issue has been fully briefed and argued by the parties. Since the matter was charged and evidence adduced on the issue and since the facts are essentially undisputed we address the question for the benefit of the board.

■ Summers sought to escape from the ambit of the statute by bifurcating the agreement into a membership transaction and a funeral services transaction. However, a critical linkage remained. The guarantee of a fixed price for the funeral services could not be obtained without the membership agreement. Accordingly, the basic service charge or membership fee is money delivered under an agreement collateral to the contract for funeral services.[9] "Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." (Civ. Code, § 1642.)

Summers argues that a self-serving avowal of independence of the basic service contract from the contract for funeral services precludes a

---

[8]The only other pertinent finding is "[t]here were two *distinct* sales or agreements." [Italics added.] The board took the position at oral argument this finding was sufficient to show that the basis of the agency action was Summers' two contracts were *collateral*. The only language in which distinct equals collateral is Newspeak.

[9]Section 7735 also provides that monies "paid *indirectly*" for a preneed funeral agreement must be put in trust. Monies received as a result of the membership agreement can be viewed as paid "indirectly" under the fixed price funeral agreement. The phrase "all money paid directly or indirectly ... under such agreement" subsumes money paid under "any agreement collateral thereto." Since this case falls within the narrower provision we analyze it in that context.

determination that it is collateral.[10] The contract provision has no such effect. The uncontradicted evidence shows that only members (that is those who paid the basic service charge) were enabled to take advantage of the guaranteed funeral contract. The record compels the inference that the substantial inducement for paying the membership charge was to obtain the right to a fixed-price funeral.[11] The basic membership contract is collateral to the fixed price funeral contract thereby requiring that moneys paid for it be placed in trust.

Any other result would allow patent circumvention of section 7735. As we recently related, "[t]he Short Act sets out an elaborate plan for the control of funds accruing under preneed funeral contracts. Its obvious purpose is to recognize the utility of a prepaid funeral arrangement and at the same time assure its performance by requiring that *all* consideration paid pursuant thereto be held in trust until the need materializes." (*Mount Vernon Memorial Park* v. *Board of Funeral Directors & Embalmers* (1978) 79 Cal.App.3d 874, 885 [145 Cal.Rptr. 275] [Italics added].) This purpose is unattainable if cosmetic manipulation of the form of the transaction allows the funeral director to tap its proceeds to pay expenses such as commissions to sales personnel, operating costs, and a return on investment.[12] (See 52 Ops.Cal.Atty.Gen. 202 (1969).)

IV

The board also grounded its order of revocation on the "remaining causes of discipline found and determined." This phrase incorporates the undifferentiated laundry list of statutes recited in sections II and III

---

[10]The provision reads: "THIS SERVICE CONTRACT IS SEPARATE AND INDEPENDENT FROM THE GUARANTEED FUNERAL CONTRACT. MEMBERS MAY OR MAY NOT TAKE ADVANTAGE OF THE GUARANTEED FUNERAL CONTRACT."

[11]Even Summers' former sales manager acknowledged that "part of what you are paying for when you pay the $200, or whatever the membership price is, is the right to a set price later on, that is one of the valuable parts."

[12]Summers' late attempt to bifurcate the agreement process between two organizations is similarly unavailing. Even if we assume arguendo that AMS is not Summers' agent, the AMS membership agreements are patently collateral to the agreement for funeral services. Accordingly, Summers, qua funeral director, is proscribed from entering into them unless the proceeds from the collateral agreement are held in trust. It is worthy of note that other statutes apparently preclude an independent party or organization, not affiliated with a funeral director, from contracting preneed to arrange to provide future funeral services, unless that person or organization is an insurer. (See Ins. Code, § 10240 et seq.; 32 Ops.Cal.Atty.Gen. 286 (1959).) In this circumstance the requirements of the Insurance Code provide equivalent protection to that of section 7735.

of the board's determination of issues, quoted *supra.* No findings appear in the board's written decision to justify the conclusion these provisions were violated.[13] The board decision provides a pudding of evidentiary facts and concludes without analysis that there are plums somewhere in it demonstrating violation of eighteen code and regulation . violations. This does not comply with *Topanga's* mandate that findings suffice to "facilitate orderly analysis and minimize the likelihood that the agency will randomly leap from evidence to conclusions." (11 Cal.3d at p. 517.) (See fn. 3 *ante.*) If the board chooses to pursue these grounds as a basis of discipline on remand it must review the evidence and articulate appropriate factual and legal conclusions.

### Disposition

The judgment is reversed and the case is remanded to the trial court with instructions to issue a writ of mandate under Code of Civil Procedure section 1094.5, setting aside the order of the board, subject to the board's right to reconsider the case on the present record in the light of this opinion. (See *Robinson v. State Personnel Bd.* (1979) 97 Cal.App. 3d 994, 1003-1004 [159 Cal.Rptr. 222].)

Regan, Acting P. J., and Carr, J., concurred.

---

[13]For example, there is no finding articulating the activities constituting the business of a funeral director (see § 7615) that Summers engaged in other than at the licensed address. Moreover, allegation of violations relating to section 7735 are superfluous since they are wholly ancillary to the underlying 7735 violation. The supplemental accusation filed against Summers laments that he has not provided the board access to his books and records. Discipline on this basis runs the risk of appearing to be board punishment for noncompliance with its administrative discovery request, a matter that should be addressed via the procedures set forth in Government Code section 11507.7.