[Civ. No. 14527. Third Dist. Feb. 7, 1975.]

THE PEOPLE, Petitioner, v.
DEPARTMENT OF HOUSING AND COMMUNITY DEVELOP-
MENT et al., Respondents;
ROY RAMEY, Real Party in Interest.

186

188

COUNSEL

Ronald L. MacMillen, District Attorney, and John H. Darlington, Assistant District Attorney, for Petitioner.

Larry Thelen for Respondent.

Downey, Brand, Seymour & Rohwer, James M. Day, Jr., and D. Steven Blake for Real Party in Interest.

OPINION

FRIEDMAN, Acting P. J.—This is a mandate action in which the People, represented by the District Attorney of Nevada County, are the petitioner. Petitioner seeks a writ compelling the state Department of Housing and Community Development and its director to rescind a permit for the construction of a mobilehome park in Nevada City. Holder of the construction permit is Roy Ramey, who appears here as real party in interest. Petitioner alleges that the permit is invalid because issued without an environmental impact report (EIR) or negative declaration under the California Environmental Quality Act (CEQA).

Recent decisions have described the operation of CEQA (Pub. Resources Code, § 21000 et seq.) in some detail and we shall not repeat these descriptions. (See *Bozung* v. *Local Agency Formation Com.* 13 Cal.3d 263 [118 Cal.Rptr. 249, 529 P.2d 1017]; *No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68 [118 Cal.Rptr. 34, 529 P.2d 66]; *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247 [104 Cal.Rptr. 761, 502 P.2d 1049].) This lawsuit involves not only CEQA but also the Mobilehome Parks Act (Health & Saf. Code, § 18200 et seq.). That act establishes a system of construction permits, annual operating permits and inspections covering mobilehome parks. It designates the state Department of Housing and Community Development as the enforce-

ment agency, but gives any county or city the option to assume responsibility for the act's enforcement within its boundaries. (Health & Saf. Code, §§ 18300, 18400.)

Early in 1973 Mr. Ramey applied to officials of Nevada City for a building permit for the proposed mobilehome park and offered to submit an environmental impact report (EIR). The project site lay within an area which had been zoned "light industrial" since 1956, when the city's then current zoning ordinance was adopted. Ramey's proposed land use was consistent with the light industrial zoning and required no use permit or variance. The city manager requested the headquarters office of the Department of Housing and Community Development to state its position as to the city's obligations relative to the EIR. On April 12, 1973, the department replied that the city planning commission would be required to submit an EIR with the mobilehome park application. On April 17 the City Attorney of Nevada City informed the state agency that he disagreed with this view of the law. He expressed the view that the proposed use was consistent with the municipal zoning ordinance and that the city had no obligation to administer the provisions of CEQA with reference to the project. Several months later, on August 1, 1973, the state agency informed the city attorney that it now agreed with his position and that the city need do no more than inform the state that a mobilehome park was a permitted use under the local zoning ordinance.

The next day, August 2, Mr. Ramey applied to the state agency for a mobilehome park construction permit. His application was supported by a building permit issued by Nevada City and a statement by the city that the use was permissible under the local zoning ordinance. On October 25, 1973, the Department of Housing and Community Development issued the permit. It did not prepare an EIR or a negative declaration under the terms of CEQA and the CEQA Guidelines.

Mr. Ramey then commenced site preparation and construction. He removed and destroyed improvements worth about $20,000 and spent about $20,000 for construction, administrative outlays and lease payments. On April 11, 1974, slightly less than six months after the construction permit had been granted, the District Attorney of Nevada County filed the present action. We issued an alternative writ of mandate and directed a halt in construction of the mobilehome park.

## I

A brief description of the alignment of parties and issues will serve as a starting point. The pleadings and briefs raise the following claims: (1) Suing in the name of the state, the district attorney charges the Department of Housing and Community Development, an agency of the state, with failure to comply with CEQA before issuing the construction permit. (2) The Department of Housing and Community Development, the state agency charged with administering CEQA in that act's application to mobilehome parks, opposes the state's position as urged by the district attorney. (3) Mr. Ramey, the real party in interest, contends that the district attorney is without "standing," that is, the district attorney has no authority to maintain this lawsuit in the state's name. (4) Ramey charges the state with laches because it did not file suit until after he had incurred a $40,000 loss in reliance upon the state's construction permit.

We shall sustain the claim of laches. The lawsuit might be decided on that relatively narrow issue without inquiry into the other issues. However, the question of compliance with CEQA presents an inquiry of ongoing importance in the administration of the Mobilehome Parks Act. Sound judicial policy impels determination of the CEQA issue, even though the case might be decided without it. We avoid inquiry into the question of standing or (as it might be more accurately described) of the district attorney's authority to sue in the state's name to restrain a claimed violation of CEQA.

There is no claim that the Nevada City authorities neglected any duty imposed by CEQA. The absence of that claim is explained by these circumstances: (1) The property had been zoned for light industrial use ever since 1956, years before the enactment of CEQA. (2) The mobilehome park lay within a light industrial zone. (3) Thus no discretionary use permit or variance was needed at the municipal level, only a city building permit. (Cf. *Lagrutta* v. *City Council,* 9 Cal.App.3d 890 [96 Cal.Rptr. 627].) (4) The municipal building permit, premised upon compliance with the local building code, was a ministerial act or project.[1]

---

[1] At this point, as in later aspects of this opinion, the following provisions of CEQA and of the CEQA Guidelines (Cal. Admin. Code, tit. 14, § 15000 et seq.) come into play.
*Public Resources Code,* section 21065:

## II

The issue, rather, is whether compliance with CEQA occurred at the

"(a) . . . . . . . . . . . . . . . . . . . . . . .
"(b) . . . . . . . . . . . . . . . . . . . . . . .
"(c) Activities involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies."

Public Resources Code, section 21169: "Any project defined in subdivision (c) of Section 21065 undertaken, carried out or approved on or before the effective date of this section [December 5, 1972] . . . if otherwise legal and valid, is hereby confirmed, validated and declared legally effective. . . ."

Public Resources Code, section 21080: "(a) Except as otherwise provided in this division, this division shall apply to discretionary projects proposed to be carried out or approved by public agencies, including, but not limited to, the enactment and amendment of zoning ordinances, the issuance of zoning variances, the issuance of conditional use permits and the approval of tentative subdivision maps (except where such a project is exempt from the preparation of an environmental impact report pursuant to Section 21166).

"(b) This division shall not apply to ministerial projects proposed to be carried out or approved by public agencies."

Guideline 15024: "Discretionary project means an activity defined as a project which requires the exercise of judgment, deliberation, or decision on the part of the public agency or body in the process of approving or disapproving a particular activity, as distinguished from situations where the public agency or body merely has to determine whether there has been conformity with applicable statutes, ordinances, or regulations."

Guideline 15032: "Ministerial projects as a general rule, include those activities defined as projects which are undertaken or approved by a governmental decision which a public officer or public agency makes upon a given state of facts in a prescribed manner in obedience to the mandate of legal authority. With these projects, the officer or agency must act upon the given facts without regard to his own judgment or opinion concerning the propriety or wisdom of the act, although the statute, ordinance, or regulation may require, in some degree, a construction of its language by the officer."

Guideline 15073: "Ministerial projects are exempt from the requirements of CEQA, and no EIR is required. The determination of what is 'ministerial' can most appropriately be made by the particular public agency involved based upon its analysis of its own laws, and it is anticipated that each public agency will make such determination either as a part of its implementing regulations or on a case-by-case basis. It is further anticipated that the following actions will, in most cases, be ministerial in nature.

"(a) Issuance of building permits.
"(b) Issuance of business licenses.
"(c) Approval of final subdivision maps.
"(d) Approval of individual utility service connections and disconnections.

"In the absence of any discretionary provision contained in local ordinance, it shall be presumed that these four actions are ministerial. Each public agency may, in its implementing regulations or ordinances, provide an identification or itemization of its projects and actions which are deemed ministerial under the applicable laws and ordinances."

See generally, Seneker, *The Legislative Response to Friends of Mammoth* (1973) 48 State Bar J. 127, 164-165.

hands of the Department of Housing and Community Development. A public permit which will culminate in a physical change in the environment is a "project" for the purpose of CEQA. (Pub. Resources Code, § 21065, subd. (c), fn. 1, *ante;* see *Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d at pp. 278-279.) When the permit application is filed, the granting agency must, as an initial matter, inquire whether the permit is a "discretionary" or a "ministerial" project as defined by CEQA. (Pub. Resources Code, § 21080, fn. 1, *ante.*) Given a discretionary project, the agency may not grant the permit without first determining in writing whether the proposal has a significant environmental impact. (*No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d at p. 79.) Mandamus lies to set aside a permit issued without that determination. (Pub. Resources Code, § 21168.5; *No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d at pp. 74-75.)

The Department of Housing and Community Development views its mobilehome park building permit as a ministerial and not a discretionary project, hence exempted from CEQA.

The Guidelines implementing CEQA contain definitions of discretionary and ministerial projects which conform, in general, to the standard legal connotations of these terms. (See *Johnson* v. *State of California* (1968) 69 Cal.2d 782, 788 [73 Cal.Rptr. 240, 447 P.2d 352].) According to the Guidelines, a discretionary project is an action requiring "the exercise of judgment, deliberation, or decision" and a ministerial project one where the officer "must act upon the given facts without regard to his own judgment or opinion concerning the propriety or wisdom of the act . . . ." (Guidelines 15024, 15032, fn. 1, *ante.*) Another Guideline suggests that certain actions, including the issuance of building permits, are ministerial in most cases. (Guideline 15073, fn. 1, *ante.*)

The law administered by a public agency supplies the litmus for differentiating between its discretionary and ministerial functions. The Mobilehome Parks Act[2] prohibits construction or operation of a mobilehome park without a construction permit from the enforcement agency.[3]

---

[2]In referring to provisions of the Mobilehome Parks Act, we employ the section numbers of the Health and Safety Code.

[3]The act designates the state Department of Housing and Community Development as enforcement agency but permits any county or city to assume enforcement responsibility within its boundaries. (§§ 18207, 18300.) When a county or city assumes enforcement responsibility, it must administer the state law and state-promulgated regulations without imposing more restrictive local regulations. (§ 18300.)

Analysis of its provisions requires the conclusion that a mobilehome park construction permit is neither wholly ministerial nor entirely discretionary; rather, that it possesses both characteristics.

The act contains a number of fixed design and construction specifications covering such matters as space occupancy, road access, toilets, showers and laundry facilities. (§§ 18610-18612, 18640-18654.) It directs the Commission on Housing and Community Development to adopt regulations covering building construction, plumbing, electrical and gas supply and fire protection. (§§ 18620, 18630, 18670, 18690-18691.)

A third class of standards is relatively broad, relatively general. The applicant for a mobilehome construction permit must submit a "description of the water supply, ground drainage and method of sewage disposal." (§ 18501.) There must be a "sufficient" supply of artificial lighting. (§ 18602.) The water supply must be "adequate" and "potable." (§ 18653.) The site must be "well-drained and graded." (§ 18681.) Instead of an unqualified construction permit, the enforcement agency may issue a conditional permit which prescribes ongoing conditions on use or occupancy. (§ 18205.)

██ To the extent that grant or denial of the construction permit is governed by fixed design and construction specifications in statute or regulation, the official decision of conformity or nonconformity leaves scant room for the play of personal judgment. In that respect the mobilehome park construction permit is comparable to a building permit and may be safely classed as ministerial. (Guidelines 15032, 15073, fn. 1, *ante.*) Conformity with the more generalized standards of the act is another matter. Whether the water supply is adequate and potable; whether sewage disposal is satisfactory; whether the site is well-drained and graded; whether lighting is sufficient; whether sub-optimum features call for use and occupancy restrictions—these are relatively personal decisions addressed to the sound judgment and enlightened choice of the administrator. These decisions may have great environmental significance relative to one physical site, negligible significance in another. Inevitably they evoke a strong admixture of discretion. Hence, grant or denial or imposition of conditions upon a mobilehome construction permit involves the agency in discretionary as well as ministerial decisions. The decision to issue a mobilehome park construction permit to Mr. Ramey was not wholly ministerial and not entirely discretionary but a compound of both.

■ In Public Resources Code section 21080 (fn. 1, *ante*), CEQA draws a line between purely ministerial and entirely discretionary projects but does not mention those having both characteristics. Statutory policy, not semantics, forms the standard for segregating discretionary from ministerial functions. (*Johnson* v. *State of California, supra,* 69 Cal.2d at p. 788.) CEQA is to be interpreted to " 'afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " (*No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d at p. 83; *Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d at p. 259.) So construed, section 21080 extends CEQA's scope to hybrid projects of a mixed ministerial-discretionary character; doubt whether a project is ministerial or discretionary should be resolved in favor of the latter characterization. So construed, section 21080 does not automatically impose an EIR on projects lacking environmental significance. It only confronts the agency with the next step in the process—to decide whether the physical proposal will have a significant environmental impact or, to the contrary, merits a negative declaration. (*No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d at pp. 79-80.)

■ Mr. Ramey's application for a mobilehome park construction permit did not confront the Department of Housing and Community Development with a project exempted from CEQA as a ministerial project. The department violated CEQA by issuing a construction permit to Ramey without first determining whether the mobilehome park would have a significant environmental impact. Although the project's conformity with local zoning might portend a negative declaration, the department's discretionary power over the project compelled it to inquire and make a finding touching its environmental impact.

### III

When this lawsuit was commenced, a CEQA provision (Pub. Resources Code, § 21167) imposed a 180-day period of limitations on suits designed to annul official action taken without a required environmental investigation.[4] The Department of Housing and Community Development issued its construction permit to Mr. Ramey on October 25, 1973, and this lawsuit was filed on April 11, 1974, between five and

---

[4]Since then, section 21167 has been amended to curtail the period of limitations when notices of official determination are filed with the Secretary of the Resources Agency (in the case of state agency decisions) or the county clerk (in the case of local decisions). See Statutes 1974, chapter 56.

six months later. Although the suit was commenced within the 180-day period of limitations, Mr. Ramey charges that it is barred by the state's laches.

■ When appropriate, laches is available to bar mandamus proceedings charging violation of environmental regulations. In several cases the courts have noted availability of laches in the context of environmental litigation instituted by a private plaintiff. (*Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d at p. 272; *Concerned Citizens of Palm Desert, Inc.* v. *Board of Supervisors* (1974) 38 Cal.App.3d 257, 265-266 [113 Cal.Rptr. 328].) In another decision its availability was noted when a public entity was plaintiff. (*County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, 812-813 [108 Cal.Rptr. 377].)

■ Laches may apply independently of any statute of limitations. (*Phelps* v. *Grady* (1914) 168 Cal. 73, 80 [141 P. 926]; *Corcoran* v. *City of Los Angeles* (1955) 136 Cal.App.2d 839, 842 [289 P.2d 556].) Establishment of the defense requires a showing of unreasonable delay plus either acquiescence or prejudice. (*Conti* v. *Board of Civil Service Commissioners* (1969) 1 Cal.3d 351, 359 [82 Cal.Rptr. 337, 461 P.2d 617]; 5 Witkin, Cal. Procedure (2d ed. 1971) pp. 3895-3896.) Laches is available in mandate proceedings filed originally in the appellate courts. (*Lewis* v. *Superior Court* (1968) 261 Cal.App.2d 736, 740 [68 Cal.Rptr. 631].) In *Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d at page 272, the court observed arguendo that, independently of the 180-day period of limitations in Public Resources Code section 21167, laches of the plaintiff or petitioner may bar a lawsuit aimed at enforcing CEQA-mandated environmental investigations.

In weighing laches as a defense to environmentally motivated lawsuits, the courts face a clash of opposing policies. Laches had its historic origin in the equity courts which insisted on "conscience, good faith, and reasonable diligence" as preconditions of equitable relief. (2 Pomeroy's Equity Jurisprudence (5th ed. 1941) p. 171.) The defense involves a large measure of judicial discretion, shaped by the exigencies of the particular case and aimed to protect the defendant against an inequitable decree. (*Brownrigg* v. *DeFrees* (1925) 196 Cal. 534, 538-539 [238 P. 714]; *Concerned Citizens of Palm Desert, Inc.* v. *Board of Supervisors, supra,* 38 Cal.App.3d at pp. 265-266.) Some courts say it "is based on estoppel;" others that it rests on the same principle as estoppel. (*Maguire* v.

*Hibernia S. & L. Soc.* (1944) 23 Cal.2d 719, 736 [146 P.2d 673, 151 A.L.R. 1062]; 30A C.J.S., Equity, § 112, pp. 24-25.) When the government is a party, invocation of either doctrine—laches or estoppel—rests upon the belief that government should be held to a standard of "rectangular rectitude" in dealing with its citizens. (*Farrell* v. *County of Placer* (1944) 23 Cal.2d 624, 627-628 [145 P.2d 570, 153 A.L.R. 323].)

In lawsuits supporting environmental legislation, an opposing policy is aroused. The strong public interest in ecology preservation has prompted both federal and state courts to reject assertions of laches. (*First National Bank of Chicago* v. *Richardson* (7th Cir. 1973) 484 F.2d 1369, 1372; *Arlington Coalition on Transportation* v. *Volpe* (4th Cir. 1972) 458 F.2d 1323, 1329-1330, cert. den., *sub. nom. Fugate* v. *Arlington Coalition* (1972) 409 U.S. 1000 [34 L.Ed.2d 261, 93 S.Ct. 312]; *County of Inyo* v. *Yorty, supra,* 32 Cal.App.3d at pp. 812-813; cf. *Concerned Citizens of Palm Desert, Inc.* v. *Board of Supervisors, supra,* 38 Cal.App.3d at pp. 265-266.) The fact that the plaintiff, private or governmental, files his suit after the developer commences construction by no means assures judicial abstention.[5] Rejection of laches in environmental suits is consistent with the general principle that equitable defenses will rarely be invoked to defeat a policy adopted for the public protection. (*City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 493-494 [91 Cal.Rptr. 23, 476 P.2d 423]; *County of San Diego* v. *Cal. Water etc. Co.* (1947) 30 Cal.2d 817, 826 [186 P.2d 124, 175 A.L.R. 747].)

Decisions involving estoppel against government feature judicial attempts at a synthesis between conflicting claims of private injustice and public interest. In order to estop the government from collecting taxes, "the case must be clear and the injustice great . . . ." (*U.S. Fid. & Guar. Co.* v. *State Bd. of Equal.* (1956) 47 Cal.2d 384, 389 [303 P.2d 1034].) In *City of Long Beach* v. *Mansell, supra,* 3 Cal.3d at pages 496-497, the California Supreme Court set forth the following formula: "The government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite to such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an

[5]Under " 'general equity principles' " one complex project was enjoined in part, permitted to proceed in part, while environment studies mandated by federal law were conducted. *Environmental Defense Fund, Inc.* v. *Froehlke* (8th Cir. 1973) 477 F.2d 1033, 1035-1037.

estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel."

■ The above formula is quite adaptable to claims of laches in counterpoise to the strong policy underlying environmental legislation. We apply it here, seeking to determine whether nullification of the developer's permit will cause injustice "of sufficient dimension" to warrant judicial refusal to force environmental procedures which should have preceded his project.

This mandate proceeding is novel; both petitioner and respondent are incarnations of a single entity, the state of California. The real petitioner is not the district attorney but the state, in whose name he invokes judicial process. (*People* ex rel. *Mosk* v. *Barenfeld* (1962) 203 Cal.App.2d 166, 175 [21 Cal.Rptr. 501].) The state here seeks a writ of mandate against its own Department of Housing and Community Development and its director. The department is not a separate entity; rather, it is an administrative segment of the state government. (Gov. Code, § 11150; *Millholen* v. *Riley* (1930) 211 Cal. 29, 32 [293 P. 69].) The director is sued in his official capacity and has no interest apart from his obligation to administer state law. The state here contends with itself through separate spokesmen, each espousing the general public interest, each expressing a conflcting view concerning the law and the status of the citizen who stands before the law. The state here seeks annulment of its own official act upon the strength of which the citizen has suffered loss and spent money to the tune of $40,000.

Forty thousand dollars represents an undebatable quantum of prejudice. The district attorney argues that the bar of laches would permit developers to rush into actual construction immediately after public approval, thus defeating anticipated lawsuits. The argument overlooks judicial refusal to tolerate such tactics. So far as the record shows, Mr. Ramey's proposal was noncontroversial; it conformed to local zoning; no hearings were held, no opposition appeared and no debate occurred. Mr. Ramey waited four months, from April to August 1972, to ascertain whether the state would require Nevada City authorities to make environmental inquiries under CEQA. Receiving official assurances that these inquiries were unnecessary, he forwarded his application to the state and, in October, received the state permit. He then commenced clearing and construction activity. Absent evidence of bad faith, he had

every right to rely upon the official permit sanctioning his proposal. The record shows no acceleration of his activities for the purpose of "beating out" opposition.

As real party in interest, Mr. Ramey has filed a sworn declaration that, since issuance of the construction permit, Nevada City has adopted a new zoning ordinance with setback provisions which, because of his property's size and shape, he cannot meet. This element gravitates in both directions, augmenting both the private injustice and the public disadvantage. The new setback lines augur somewhat greater environmental cost than that originally conceived. Nevertheless, when the developer applied for a construction permit, his plans conformed to local zoning demands without need for a variance, thus justifying the inference that its environmental disadvantages were minimal. The project's location in an area recently zoned as light industrial justifies the conclusion that it will not inflict gross environmental damage.

Several circumstances are advanced to justify the five-and-one-half month lapse between grant of the state permit and commencement of the lawsuit. Included in the record is the declaration of a deputy district attorney of Nevada County, who states that not until the latter part of March 1974 was he aware that Mr. Ramey had obtained a mobilehome park construction permit; upon being informed that CEQA might have been violated, he filed this lawsuit.

Also in the record is the declaration of a private attorney in Nevada City, who states that in November 1973 (the month after the Ramey permit was issued) a client requested him to stop the project; he then entered into discussions with representatives of the state Attorney General; not until March 1974 did a representative of the Attorney General inform him that the Department of Housing and Community Development "contrary to the advice of counsel" believed that no EIR was necessary; the declarant then informed his client that he would not file the lawsuit "because of insufficient time."

Neither declaration reveals any connection between the inquiries of the private attorney and the district attorney's decision to enter the picture.

Attached as an exhibit to the petition for mandate is a letter of advice from the state Attorney General's office to the Department of Housing

and Community Development dated February 16, 1973, expressing the opinion that permits issued under the Mobilehome Parks Act entailed the exercise of discretion and were subject to the requirements of CEQA.

Accompanying the responsive pleading of the Department of Housing and Community Development are a number of documents. Several of these demonstrate that Mr. Ramey's project represented a land use conforming to the local zoning ordinance of Nevada City. Another is the declaration of an official of the Department of Housing and Community Development stating that in July 1973 a deputy state attorney general had orally advised him that the City Attorney of Nevada City was correct in his view that the project's conformity with existing zoning dispensed with the necessity of an EIR or negative declaration. According to the declaration, the deputy attorney general advised the declarant that the department had no authority to withhold Mr. Ramey's mobilehome park construction permit.

CEQA imposed no ongoing surveillance duty on the district attorney. Once he had information which in his opinion justified a lawsuit, the district attorney acted without delay. In the assessment of unreasonable delay and prejudice, the district attorney was not the sole instrumentality through which the state acted. Laches is charged not against the district attorney as an individual officer, but against the state, which now demands that the state nullify what it once permitted. The district attorney cannot assume to act as spokesman of the state without bearing responsibility for the acts of other state agents, namely, the Department of Housing and Community Development. In measuring the quantum of injustice, we must take into account "the continuing course of conduct by which the governmental agency had induced reliance." (*City of Long Beach* v. *Mansell, supra,* 3 Cal.3d at p. 498.)

The declaration of the department administrator describes legal advice from the Attorney General which satisfactorily explains why the department dispensed with environmental inquiries at the hands of the Nevada City officials but not why it failed to make environmental inquiries itself. The state's spokesman fails to explain why, in the face of the Attorney General's written opinion of February 1973, the department issued a construction permit without itself making environmental findings mandated by CEQA. Even if the oral advice of the deputy attorney general in July 1973 were interpreted as sanction for a construction permit without environmental inquiry, the department does

not explain why it followed that advice instead of the contrary written opinion of the Attorney General.

Compliance with environmental protection legislation necessarily imposes delay and expense upon development projects. Administrative policy shifts and legally dubious rulings enormously inflate the delay and expense. Consistent policies and unimpeded intragovernmental communications are vital to the avoidance of bureaucratic entanglements. There is little good in protecting the environment for the sake of a society which fails to insist on fair treatment of its citizens.

Here the state, represented by one agency, received written legal advice describing its environmental responsibilities; the applicant citizen received a permit on the assumption that the agency had met its responsibilities; on the strength of that assumption he commenced his project, incurring substantial expenses and losses over a period of months; only then did the state, acting through another agent, seek judicial action to annul what it had once granted; the citizen's losses are largely irrecoverable; the project is one which conformed with local land use regulations at its inception, hence not recognizable as a gross despoliation of the environment. The state's failure to commence its suit before the citizen incurred heavy loss created an injustice which outweighs any adverse effect of the state's failure to make timely environmental inquiries. We sustain the defense of laches.

■ Health and Safety Code section 18509 terminates mobilehome park construction permits when the project has not been completed within six months. The statute envisions a time span in which the processes of the law leave the developer free to proceed. During the time span covered by this court's stay order, the six-month period applicable to Mr. Ramey's construction permit is tolled.

The peremptory writ is denied. This court's interim order staying further construction of the mobilehome park will terminate on the date this decision becomes final.

Paras, J., concurred.

A petition for a rehearing was denied February 26, 1975, and petitioner's application for a hearing by the Supreme Court was denied April 16, 1975. Richardson, J., did not participate therein.