Filed 4/3/14  Singer v. County of LA Depart. of Mental Health CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JAY SINGER,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>COUNTY OF LOS ANGELES<br>DEPARTMENT OF MENTAL HEALTH,<br><br>    Defendant and Respondent. | B243486<br><br>(Los Angeles County<br>Super. Ct. No. BS129788) |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Ann I. Jones, Judge.  Affirmed.

        Spiegel Liao & Kagay and Charles M. Kagay for Plaintiff and Appellant.

        Hausman & Sosa, Jeffrey M. Hausman, Larry D. Stratton and Vincent C. McGowan for Defendant and Respondent.

Appellant Jay Singer, M.D. (Dr. Singer),[1] a psychiatrist, was discharged from his civil service employment by respondent County of Los Angeles Department of Mental Health (DMH). Dr. Singer filed an administrative appeal with Los Angeles County Civil Service Commission (Commission), which upheld his discharge. Dr. Singer then filed a petition for writ of mandate, seeking to overturn Commission's ruling. (Code Civ. Proc., § 1094.5.) In this appeal from the judgment of denial, Dr. Singer contends he was denied a fair administrative hearing as a result of laches and insufficient notice. We reject Dr. Singer's contentions and affirm.

## BACKGROUND

In May 2004, DMH hired Dr. Singer to work as a psychiatrist at a county mental health facility. Eight months later in January 2005, DMH placed Dr. Singer on paid administrative leave and began investigating allegations of possible misconduct. In May 2005, DMH notified Dr. Singer of the specific charges against him. In June 2005, Dr. Singer denied the charges.

In September 2006, DMH issued a notice of intent to discharge and scheduled a *Skelly* meeting[2] for October 10, 2006. At Dr. Singer's request, DMH postponed the *Skelly* meeting to November 16, and again to December 7, 2006, while Dr. Singer reviewed certain evidence in DMH's possession.

---

[1]    Dr. Singer is also known as Jobst Singer.

[2]    "In *Skelly* [*v. State Personnel Bd.* (1975)] 15 Cal.3d 194, the California Supreme Court held that in order to satisfy due process, an agency considering disciplinary action against a public employee must accord the employee certain 'preremoval safeguards,' including 'notice of the proposed action, the reasons therefor, a copy of the charges and materials upon which the action is based, and the right to respond, either orally or in writing, to the authority initially imposing discipline.' (*Id*. at p. 215.) The Supreme Court's directive gave rise to an administrative procedure known as a *Skelly* hearing, in which an employee has the opportunity to respond to the charges upon which the proposed discipline is based." (*Flippin v. Los Angeles City Bd. of Civil Service Commissioners* (2007) 148 Cal.App.4th 272, 280 (*Flippin*).)

After the *Skelly* meeting was held on December 7, 2006, DMH issued a notice of discharge on December 19, 2006. On January 4, 2007, Dr. Singer appealed his discharge to Commission, which granted his request for a hearing on March 7, 2007. On November 28, 2007, Dr. Singer, who was in pro. per., requested a two- or three-month continuance of the administrative hearing in order to review certain charts that he had seen only briefly prior to the *Skelly* hearing.

The administrative hearing began on December 11, 2007, and ended after more than a dozen sessions on May 11, 2009. During the hearing, Dr. Singer requested documents and confidential patient files from DMH and others. After the final session, the hearing officer kept the record open while Dr. Singer pursued a petition for writ of mandate to obtain patient files from California Employment Development Department (EDD). The petition to obtain EDD's patient files was denied on September 10, 2009.

The administrative hearing record was closed on March 26, 2010; closing briefs were submitted on April 9, 2010; and the hearing officer's proposed ruling to deny the appeal was filed on May 14, 2010. The Commission adopted the hearing officer's proposed ruling and issued a final decision upholding Dr. Singer's discharge on September 29, 2010.

On December 17, 2010, Dr. Singer filed the present writ of mandate action seeking to overturn Commission's ruling. (Code Civ. Proc., § 1094.5.) After the matter was briefed and heard, the superior court entered a judgment of denial on June 25, 2012. Dr. Singer timely appealed from the judgment. Additional facts relevant to the appeal are included in the discussion below.

## DISCUSSION

Dr. Singer contends the trial court erred in rejecting his affirmative defense of laches by: (1) holding him responsible for some if not all of the alleged delay in the hearing process; and (2) finding he was not prejudiced by the alleged delay (if any) in the hearing. Dr. Singer also contends the trial court erred in rejecting his claim of

3

insufficient notice of the charges.  For the reasons set forth below, we conclude the contentions lack merit.

## I.    Standard of Review

A trial court's review of an administrative order or decision extends to "the questions whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence."  (Code Civ. Proc., § 1094.5, subd. (b).)

"The applicable standard of review in a mandamus proceeding depends on the right at issue.  When a fundamental vested right is involved, such as the right of a [public] employee to continued employment [citation], the trial court exercises its independent judgment to determine whether due process requirements were met and whether the agency's findings are supported by the weight of the evidence.  [Citations.]" (*Flippin*, *supra*, 148 Cal.App.4th at p. 279.)  "In exercising its independent judgment, a trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence."  (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817.)

After the trial court independently assesses the administrative record, the trial court's legal rulings are subject to the appellate court's independent review, while its factual rulings will be affirmed if supported by substantial evidence.  (*Vinson v. Snyder* (1999) 75 Cal.App.4th 182, 186.)  The appellate court reviews the trial court's rulings but not those of the administrative agency.  (*Spitze v. Zolin* (1996) 48 Cal.App.4th 1920, 1925.)

4

**II.    Additional Relevant Facts**

In his petition for writ of mandate, Dr. Singer raised several grounds for overturning Commission's decision to uphold his discharge.  In the following sections, we focus on the two grounds raised on appeal—laches and insufficient notice.

### A.    *Dr. Singer's Contentions of Laches and Insufficient Notice*

As to the affirmative defense of laches, Dr. Singer alleged that because he was made to "wait for several years" before his disciplinary review was completed, DMH and Commission failed to proceed in the manner required by law.  In his memorandum of points and authorities, he claimed that the action was delayed for over five years—from the start of his administrative leave (Jan. 27, 2005) to Commission's final ruling (Sep. 29, 2010)—which was "longer than nearly any civil statute of limitations."  In his reply papers, he more narrowly claimed that the action was delayed for almost three years— from the start of his administrative leave (Jan. 27, 2005) to the first hearing before Commission (Dec. 11, 2007)—which allegedly resulted in a prejudicial loss of evidence.

As to insufficient notice, Dr. Singer alleged that his discharge was affirmed by Commission based on new charges that were not included in the notice of discharge. Dr. Singer contended that because of the discrepancies between DMH's notice of discharge and Commission's findings, DMH and Commission did not proceed in a manner required by law.

### B.    *DMH's Opposition*

In opposition to the petition, DMH argued that Dr. Singer was responsible for delaying both the *Skelly* hearing and the administrative hearing.  DMH also argued that the notice of discharge properly set forth the charges that were upheld by Commission.

5

## C.     The Trial Court's Ruling

After independently reviewing the administrative record, the trial court rejected Dr. Singer's contentions and found that DMH and Commission had proceeded in the manner according to law.

As to Dr. Singer's claim of laches, the trial court made four main rulings.  First, the trial court found that Dr. Singer had failed to petition for administrative review of a due process violation claim.  The trial court cited Los Angeles County Civil Service Rule 4.03C (rule 4.03C), which states:  "When granting a hearing, the commission shall state the specific issue(s) in the petition to be heard and will notify all the parties in writing of the issue(s).  No other issues will be heard."

Second, the trial court found Dr. Singer was responsible for some if not all of the delay in the proceedings, stating:  "[Dr. Singer] alleges that [DMH] delayed for an unreasonably long period of time . . . between the serving of charges and the hearing in his case.  [Dr. Singer] fails to meet his burden . . . .  [¶]  [A] review of the lengthy record evidences that [Dr. Singer] was responsible—in part if not entirely—for the time taken in the hearing process.  On a number of occasions, including during the *Skelly* process, [Dr. Singer] asked for continuances or was unavailable.  Moreover, as shown in the Administrative Record, many of the delays were occasioned by [Dr. Singer]'s poor understanding of exactly what information was properly within the custody and control of his employer and what was not.  Requests that his employer produce medical records from other hospitals, or requests for information from the EDD and other State Agencies by [Dr. Singer] were wholly improper and were not a ground upon which to afford him further continuances.  In fact, on a number of occasions, [DMH] objected to the hearing officer granting [Dr. Singer]'s request for additional time—which were overruled by the hearing officer.  Moreover, [Dr. Singer]'s own cross-examination of witnesses, which was argumentative and (in some instances) harassing, further protracted the proceedings.  Hearing Officer Stiglitz bent over backwards to try to give [Dr. Singer] all of the latitude he requested and, as a self-represented litigant, required.  To have it now argued that

6

these [Dr. Singer]-caused delays constituted an improper process is wholly unjustified." (Fn. omitted.)

Third, the trial court found that DMH did not improperly withhold evidence and that Dr. Singer had received all of the requested information in DMH's custody and control. The trial court found that Dr. Singer failed to "adduce particularized evidence to support his claim that the Commission or [DMH] failed to proceed in a manner required by law with regard to the production of relevant evidence. The administrative record sets forth in excruciating detail the efforts undertaken to ensure that [Dr. Singer] would have access to all of the information in [DMH's] custody and control that Dr. Singer thought he needed in order to defend certain of these charges. The protections afforded patient information under federal and state law made this process time-consuming. But, in the end, necessary notices, protective orders and redactions were performed (by [DMH]) to enable Dr. Singer to rebut claims made against him regarding his own treatment of clinic patients." (Fns. omitted.)

In addition, the trial court found that Dr. Singer's "claim of prejudice in support of his laches argument is unsupported by even a scintilla of evidence in the record. [Dr. Singer] argues that he would have been able to locate two physicians who did not use the scheduling software had the hearings been more prompt. However, there is no evidence that [Dr. Singer] even attempted to subpoena these physicians as witnesses. And, assuming that such testimony had been obtained[,] that others defied rules and regulations does not constitute a defense to [Dr. Singer]'s insubordination. See Marino v. City of Los Angeles, 34 Cal.App.3d 461, 466 (1973) ('there is no requirement that charges similar in nature must result in identical penalties'). [¶] As prejudice has not been demonstrated and delay (if there was any) was self-inflicted, the passage of time in [Dr. Singer]'s case does not support a claim that [Commission] failed to proceed in a manner according to law. 'The passage of time in itself is neither a denial of due process nor a jurisdictional defect, absent a showing of specific prejudice.' Rhodes v. State Bar of California, 49 Cal.3d 50, 60 (1989)." (Internal record reference omitted.)

Fourth, the trial court found that even if Dr. Singer were able to procure the allegedly missing evidence and witnesses, he would not be able to undo the damage caused by his own admissions. The trial court stated: "As to other charges—e.g., [Dr. Singer]'s refusal to review the entire treatment record before seeing a patient; [Dr. Singer]'s insistence on keeping treatment files on his personal computer, despite being ordered not to do so; [Dr. Singer]'s refusal to use the CASS [computer-assisted scheduling system]; and repeated examples of extreme interpersonal conflict with certain staff members; and his ignorance of certain medications or treatment protocols— [Dr. Singer] *admitted* to these practices. There was no need to obtain confidential patient records or other records to defend against these allegations. Records generated by a system would not have rebutted [Dr. Singer]'s own startling boast that he didn't read the records before he attended mentally ill patients. Speculative claims of prejudice at this stage do not meet [Dr. Singer]'s burden."

As to insufficient notice, the trial court found there were no discrepancies between DMH's notice of discharge and Commission's findings. The trial court found that the notice of discharge "clearly and unequivocally enumerated the bases upon which [Dr. Singer] was being discharged"—which included "insubordination, professional incompetence, and failing to perform his duties and responsibilities as a treating physician in a satisfactory manner"—and that Commission's findings directly tracked the grounds stated in the notice of discharge. The court noted that even if Dr. Singer were able to establish a variance, he would not be able to show "that the Commission failed to proceed in a manner according to law. Courts have consistently rejected a claim of due process deprivation based on a variance between the evidence adduced at the hearing and the allegations set forth in the charging document. See, e.g., Margarito v. State Athletic Commission, [1]89 Cal.App.4th 159, 169-171 (2010); Berg v. Davi, 130 Cal.App.4th 223, 228-229 (2005)."

8

**III. Dr. Singer's Defense of Laches Was Properly Rejected by the Trial Court**

Dr. Singer contends the trial court erred in holding him responsible for any delay in the hearing process. Dr. Singer states that "[a] review of the record shows that this simply is not so—the delay in bringing this matter to hearing was engineered by DMH and the Civil Service Commission." For the following reasons, we disagree.

*A.     The Affirmative Defense of Laches*

Laches is an affirmative defense that "may apply independently of any statute of limitations." (*People v. Department of Housing & Community Dev.* (1975) 45 Cal.App.3d 185, 195.) Unlike a statute of limitations, which applies regardless of the existence of prejudice, "[t]he affirmative defense of laches requires unreasonable delay in bringing suit and resulting prejudice to the defendant. (*Miller v. Eisenhower Medical Center* (1980) 27 Cal.3d 614, 624.) Whether laches has occurred in a particular case is primarily a question of fact for the trial court and an appellate court will not interfere with the trial court's decision unless it is obvious a manifest injustice has occurred or the decision lacks substantial support in the evidence. (*Vernon Fire Fighters Assn. v. City of Vernon* (1986) 178 Cal.App.3d 710, 724-725.)" (*Transwestern Pipeline Co. v. Monsanto Co.* (1996) 46 Cal.App.4th 502, 519-520 (*Transwestern Pipeline*).)

*B.     The Trial Court's Finding That Laches Did Not Occur Is Supported by Substantial Evidence*

We conclude that substantial evidence supports the trial court's finding that there was no unreasonable delay in prosecuting the disciplinary action.

1.     The Notice of Charges Was Not Unreasonably Delayed

Dr. Singer contends that when his administrative leave of absence began on January 27, 2005, DMH had already decided to terminate him. He argues the initial three-month investigation that led to the issuance of the notice of charges on May 6, 2005, was an unreasonable delay in prosecution because his termination was a foregone

conclusion. In support of his contention, Dr. Singer cites the January 27, 2005 letter informing him of his administrative leave of absence. However, we see nothing in the letter that indicates that a decision to terminate Dr. Singer had already been made. Accordingly, the contention lacks merit.

      2.      <u>The Investigation That Preceded the *Skelly* Meeting Was Not Unreasonably Delayed</u>

The investigation that preceded the *Skelly* meeting, when measured from the beginning of Dr. Singer's administrative leave of absence (Jan. 27, 2005) to the date originally set for the *Skelly* hearing (Oct. 10, 2006), lasted more than 20 months. Dr. Singer contends that this constituted an unreasonable delay in the disciplinary proceedings.[3]

Dr. Singer cites *Gates v. Department of Motor Vehicles* (1979) 94 Cal.App.3d 921 (*Gates*), which involved a delay of over 15 months in the revocation of an automobile dismantler's license. In that case, the appellate court deferred to the trial court's factual findings that "there was no reasonable explanation for the delay, and that respondent was prevented from getting a fair hearing as a result of that delay." (*Id.* at p. 925.)

*Gates* is distinguishable, however, because the rules for revoking an automobile dismantler's license do not apply to a civil service employment termination case. In *Gates*, the Department of Motor Vehicles delayed filing an accusation against the auto dismantler for about 15 months after its investigation was complete. (*Id*. at p. 923.) In

---

[3]     The purpose of a *Skelly* hearing is to comply with due process requirements before a public employee may be discharged. (*Flippin*, *supra*, 148 Cal.App.4th at p. 280.) If Dr. Singer wished to have Commission overturn his discharge based on laches, he was required to raise that issue in his petition for administrative review. Dr. Singer's failure to do so precluded Commission from ruling on his laches defense. (Rule 4.03C.)

In objecting to the hearing officer's proposed ruling, Dr. Singer identified several issues but did not mention the laches defense (either by use of the term "laches" or by reference to any unreasonable delay in the proceedings). Given these facts, we would be justified in concluding that the laches defense was forfeited. We nevertheless will address the merits of Dr. Singer's contentions.

10

contrast, here, the evidence showed DMH's investigation continued between the May 6, 2005 notice of charges against Dr. Singer and the September 12, 2006 notice of intent to discharge. In this case, the trial court found that DMH was *not* dilatory in conducting its investigation or in setting the matter for a *Skelly* hearing. Dr. Singer has not shown this conclusion lacks substantial support in the evidence. Moreover, as discussed below, there was no showing of prejudice resulting from the passage of time that occurred before the *Skelly* meeting.

### 3. The *Skelly* Meeting Was Not Unreasonably Delayed

The trial court found that the two-month postponement of the *Skelly* meeting from October 10 to December 7, 2006, was not an unreasonable delay in prosecution because the postponement was granted at Dr. Singer's request. (See *Gates*, *supra*, 94 Cal.App.3d at p. 924 [four-month delay between filing of the accusation and commencement of the administrative hearing was not unreasonable, particularly since the employee was responsible for 30 days of the delay].)

On appeal, Dr. Singer contends the two-month postponement was "simply his effort to get DMH to let him see documents relevant to his defense that he had been requesting since May 2005." However, the trial court found that DMH had produced all of the materials in its possession that Dr. Singer was entitled to receive. Although Dr. Singer may believe the production was untimely or incomplete, he has failed to show that the trial court's finding to the contrary was erroneous. As the trial court correctly stated, a discharged employee has no constitutional right to pretrial discovery before a *Skelly* meeting (citing *Holmes v. Hallinan* (1998) 68 Cal.App.4th 1523, 1534; *Gilbert v. City of Sunnyvale* (2005) 130 Cal.App.4th 1264, 1280 [no due process violation even if additional documents are produced after the hearing]). We therefore conclude that the two-month postponement of the *Skelly* hearing, which was granted at Dr. Singer's request, did not constitute an unreasonable delay in prosecution. (See *Gates*, *supra*, 94 Cal.App.3d at p. 924.)

11

### 4. The Administrative Hearing Was Not Unreasonably Delayed

Dr. Singer contends that Commission failed to provide a timely hearing. The record, however, shows otherwise. On January 4, 2007, Dr. Singer requested a hearing with Commission on the termination. That request was granted on March 7, 2007, and on July 31, 2007, Commission notified the parties that the hearings would commence December 11, 2007. Dr. Singer did not object to the delay in commencing the hearing. In fact, the record shows that shortly before the administrative hearing began, Dr. Singer requested a delay of two to three months so that he could conduct additional investigation. On the first day of the administrative hearing, Dr. Singer told the hearing officer he was not prepared to proceed and requested a continuance. Under the circumstances, the trial court properly refused to hold Commission at fault for the delay in starting the hearing.

In a related contention, Dr. Singer argues that Commission unreasonably prolonged the administrative hearing, which began on December 11, 2007, and ended with the final ruling on September 29, 2010. We disagree. The record shows that once the hearing began, the hearing officer repeatedly accommodated Dr. Singer's scheduling issues and kept the administrative record open for several months *after* the final hearing while Dr. Singer pursued a writ of mandate action against EDD. After Dr. Singer exhausted his efforts against EDD, the administrative record was closed and the hearing proceeded at a steady pace—closing briefs were submitted on April 9, 2010, the hearing officer's proposed ruling was filed on May 14, 2010, and the Commission's final ruling was issued on September 29, 2010.

### C. *Because Dr. Singer Failed to Prove There Was an Unreasonable Delay in Prosecution, We Need Not Reach the Issue of Prejudice*

As previously mentioned, the determination whether laches has occurred "is primarily a question of fact for the trial court." (*Transwestern Pipeline*, *supra*, 46 Cal.App.4th at p. 519. ) Where, as here, the trial court's determination that there was no unreasonable delay in prosecution is supported by substantial evidence, the appellate

12

court will defer to the trial court's finding. (*Id.* at pp. 519-520.) Because there was no unreasonable delay in prosecution, Dr. Singer's affirmative defense of laches necessarily must fail. We therefore need not reach the issue of prejudice.

Nevertheless, we proceed to consider whether Dr. Singer has demonstrated that he was prejudiced by delay and find there was no prejudice.

### D. There Was No Prejudice

As the court in *Brown v. State Personnel Bd.* (1985) 166 Cal.App.3d 1151, 1159 (*Brown*), observed: "It is said that '[t]here is no fixed rule as to the circumstances that must exist or as to the period of time which must elapse before the doctrine of laches can be appropriately applied.' [Citation.] That is so because what generally makes delay unreasonable is that it results in prejudice. 'These two factors are interrelated . . . .' [Citation.] '"It is not so much a question of the lapse of time as it is to determine whether prejudice has resulted. If the delay has caused no material change *in status quo*, *ante*, i.e., no detriment suffered by the party pleading the laches, his plea is in vain."' [Citation.] Because of the relationship between prejudice and delay the circumstances which give rise to laches vary widely depending upon their interplay in the specific case."

We proceed now to consider the specific claims of prejudice Dr. Singer advances on appeal.

### 1. Patient 1

Documents were presented at the hearing regarding the treatment of eight patients whose medical records were protected by law. The hearing officer concluded that Dr. Singer misdiagnosed patient 1. Those patient records outside of DMH's control were inaccessible to Dr. Singer unless the patients gave their written consent. DMH was able to contact patient 1, but she declined to provide consent and later she could not be reached.

DMH of course had no control over whether patient 1 consented to her records being used. The record demonstrates that DMH did all it could to access her records.

13

Any possible prejudice caused by her refusal to consent cannot be charged to DMH. The fact she was unavailable at a later date when DMH again attempted to contact her also cannot be blamed on DMH, as the passage of time was irrelevant given that DMH had located her previously. No prejudice was demonstrated as to the findings made against Dr. Singer regarding patient 1, the only patient regarding whom Dr. Singer specifically argues he suffered prejudice.

### 2. Emails Regarding Using Computer-Assisted Scheduling System (CASS)

Wendi Tovey, program head at the mental health facility where Dr. Singer worked, testified she believed she had sent Dr. Singer emails directing him to use CASS to schedule patient appointments, but by the time of the hearing those emails no longer existed. The hearing officer relied instead on Tovey's testimony that she specifically instructed Dr. Singer to use CASS but he refused. In concluding that Dr. Singer defied a direct order to use the scheduling system, the hearing officer obviously did not credit Dr. Singer's testimony that he was not instructed to use the scheduling system and that Dr. Kopelowicz, the medical director at the mental health facility, actually told him doctors were not required to use it.

The issue of the unavailability of Tovey's emails regarding use of the CASS system is immaterial. We note that Tovey testified she *believed* she had sent emails to DMH staff and specifically to Dr. Singer regarding use of the scheduling system. She also stated that until recently she had routinely emptied her email on a daily basis because she sent and received so many emails. We are thus left with purely speculative conjecture that prejudice resulted. It is unclear whether such emails ever existed, and unlikely that it was delay that caused their unavailability if they were in fact generated. More to the point, the trial court found credible Tovey's and Dr. Kopelowicz's testimony that they directly ordered Dr. Singer in person to use the scheduling system. Dr. Singer has not demonstrated prejudice in this regard.

14

3.     Service Logs and Related Data

Part of the evidence relied on at the hearing consisted of service logs documenting the details of each patient's care. Dr. Singer asserts that DMH kept only the logs it found favorable to its case and produced them to Dr. Singer, but discarded the rest and blamed their absence on the passage of time or inadvertence. The service logs were relied upon by DMH to prove that Dr. Singer failed to review charts prior to seeing patients and failed to make chart notes recording his treatment activities with patients. The logs also were used to construct unfavorable no-show statistics to establish a high rate of patient dissatisfaction with Dr. Singer (i.e., it was inferable that patients did not keep scheduled appointments because they were dissatisfied with Dr. Singer's care).

DMH presented as evidence exhibits 37 and 38. Exhibit 37 was a compilation of source documents including select representatives of Dr. Singer's daily service logs. Exhibit 38 was a summary purporting to show Dr. Singer had not properly documented his treatment activity. It was prepared using data found in exhibit 37 by "pulling each individual record, looking at the daily service log or the claim, and then going into the record, looking at the progress note and medication note or log." By the time Dr. Singer cross-examined the witness who prepared exhibit 38, the underlying data had been discarded. However, the evidence showed the hearing officer did not rely on that evidence but instead credited other testimony on this point.

The hearing officer specifically found that Dr. Singer's no-show rate was not critical to the resolution of the case and stated that he had not reviewed the source documents relied upon by DMH or by Dr. Singer. Independent of that documentary evidence, Dr. Kopelowicz testified that the number of complaints registered against Dr. Singer, given his short tenure at DMH, was unusual.

In addition, the hearing officer did not sustain the allegation that Dr. Singer failed to enter chart notes. Given the conflict in the evidence presented in exhibits 37 and 38 versus that presented in Dr. Singer's own analysis, the hearing officer stated: "I am reluctant to conclude that the problems here were Dr. Singer's. Although he might have avoided this problem by physically entering chart notes, it is possible that Dr. Singer did

15

submit chart notes for filing and that the gaps were due to filing errors." Thus, evidence from selective service logs was not credited to establish failure to record chart notes.

The one allegation relating to charts that the hearing officer did sustain against Dr. Singer was that he failed to *review* charts prior to seeing patients. In that regard, Dr. Singer told Dr. Kopelowicz that he did not feel it was necessary to review charts prior to seeing patients because he was not interested in the opinions of other clinicians who were not psychiatrists, and he was not interested in reviewing patient histories. He relied solely on his own examinations and opinions. Thus, the hearing officer relied upon Dr. Kopelowicz's testimony rather than service logs in concluding Dr. Singer did not review patient charts.

In summary, we conclude that Dr. Singer has not demonstrated that he was prejudiced because delay in the hearing caused service logs to be lost or discarded.


### 4. Loss of a Key Witness

Finally, Dr. Singer argues that a key witness became unavailable with the passage of time. Specifically, there was evidence regarding disputes between Dr. Singer and a psychiatric nurse, Florencio Arceno, who had moved to the Philippines by the time of the hearing.

Dr. Singer does not deny he had conflicts with Arceno, but he claims that Arceno was the provocateur of the conflicts. However, even if Arceno was responsible for the conflicts, other witnesses including a coworker, La Tina Jackson, testified that Arceno complained of Dr. Singer's treatment of him, citing specific instances of conflict. Jackson testified she overheard them arguing loudly in an unprofessional manner. Even if Arceno had been the instigator of that argument, Dr. Singer's unprofessional conduct in loudly arguing with Arceno was established by Jackson's testimony, which was credited by the hearing officer. We find no prejudice resulted from Arceno's unavailability (which may or may not have been due to the passage of time).

16

**IV.    Notice of the Allegations Supporting Discharge Was Proper**

In the notice of discharge, DMH stated numerous grounds for terminating Dr. Singer's employment, including:  (1) the failure to maintain high standards of professional competence and quality of service; (2) the failure to "review charts of existing clinic clients, who were new to" Dr. Singer; and (3) the failure to review patients' existing medication orders and medical history before prescribing medication. As to the second allegation—that he did not "review charts of existing clinic clients, who were new to [him]"—Dr. Singer contends that because DMH produced evidence of a much broader issue—that he generally did not read patients' charts before seeing them— there was a fatal variance between the notice of discharge and Commission's findings. We disagree.

The record demonstrates that Dr. Singer was aware of the broader charge concerning the failure to review patients' charts, which he addressed at the hearing.[4] There is no failure of due process where, as demonstrated by the record in this case, the complaining party has been informed of the substance of the charge and afforded the opportunity to address the issue.  (*Stearns v. Fair Employment Practice Com.* (1971) 6 Cal.3d 205, 213.)  The trial court, having found the charge sustained by Commission to

---

[4]    Dr. Singer stated:  "And then, there's a new allegation.  I don't know to what extent I have to address this.  But the allegation is that I did not check out any charts before seeing patients.  That was not in the letter of termination, but I'll respond to it anyway.  It's true that I didn't — I didn't check out all the charts of patients up until a certain point, which was when Dr. Kopelowicz — he started bringing me my charts in the morning, after — of course, after I submitted the list.  And then, it wasn't even clear for a couple times why he was doing this.  And then, finally he said that, 'I want you to check out every chart so you can file every note in the chart, because you are part-time.  And as such, we have to provide coverage for you.  And so every note has to be in the chart. Otherwise, if you were full-time, we wouldn't be having this conversation.'"  In addressing the fact that he was told by Dr. Kopelowicz to check out and file notes in every chart, Dr. Singer stated, "each time I see a patient, even if I don't check out the chart, I have available to me my medical evaluation, my complete medical evaluation, my notes, which are in much better order and clarity to review than the charts, which makes consequently, it much more safe in taking care of the patients."

17

be true, "was required to uphold the penalty imposed if there was any reasonable basis for doing so.  [Citation.]"  (*Flippin*, *supra*, 148 Cal.App.4th at p. 283.)

## DISPOSITION

The judgment is affirmed.  Costs on appeal are awarded to DMH.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, J.[*]

We concur:


EPSTEIN, P. J.


WILLHITE, J.

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.