Filed 6/17/14  Thein v. State Personnel Board CA3

## <u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Plumas)

----

| | |
|---|---|
| PAUL THEIN et al., | C073066 |
| Plaintiffs and Respondents, | (Super. Ct. No. CV1100256) |
| v. | |
| STATE PERSONNEL BOARD, | |
| Defendant and Respondent, | |
| FEATHER RIVER COMMUNITY COLLEGE, | |
| Real Party in Interest and Appellant. | |

Plaintiffs Paul Thein, Laurel Wartluft, and Michelle Henley (previously known as Michelle Jaureguito) were employees of Feather River Community College (FRCC). They filed whistleblower retaliation complaints against the college after they were terminated, or, in the case of Henley, constructively terminated.  The administrative law judge (ALJ) ruled in their favor, but the State Personnel Board (SPB) rejected that

1

decision and dismissed the complaints, finding each plaintiff failed to demonstrate that he or she had made protected disclosures under the Reporting by Community College Employees of Improper Governmental Activities Act (the Act) (Ed. Code, §§ 87160 et seq.).

Plaintiffs petitioned the Plumas County Superior Court for a writ of administrative mandamus. (Code Civ. Proc., § 1094.5.) The superior court granted the writ, finding the SPB erred in interpreting what was a protected disclosure under the Act. The peremptory writ of mandamus commanded the SPB to set aside its decision as to all three plaintiffs and to reconsider their complaints in light of the court's ruling and judgment.

FRCC appeals, contending the SPB correctly applied the law to the facts and plaintiffs did not engage in whistleblowing activities because their reports were part of their normal job duties. FRCC further contends substantial evidence supports the SPB's findings as to Wartluft and Henley's alleged protected disclosures, and plaintiffs' writ petition was barred by the statute of limitations and laches.

We find that in all instances but one, the SPB's factual findings do not support its conclusion that the disclosure at issue was not a protected disclosure. We also find that plaintiffs' writ petition was timely. Accordingly, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

*The College*

FRCC is a small community college in Quincy. In 2005, it had approximately 1,500 students, many of them part-time. FRCC employed 30 full-time faculty, 55 part-time instructors, and 50 classified (non-instructional) employees. Susan Carroll was the President of FRCC. Cameron Abbott was the Director of Human Resources.

*Paul Thein*

Thein began work at FRCC in 1999 as Dean of Students. In 2001, he was named athletic director and three years later he was promoted to Vice President of Student

2

Services and Institutional Development. He reported directly to President Carroll. He retained his position as athletic director.

In the fall of 2004, Thein began speaking with Carroll about the need to fill the position of women's head basketball coach as a tenure track position similar to the men's basketball coach. He believed the tenure track position was necessary to retain federal aid and comply with Title IX. Thein wanted the current acting head coach, Laurel Wartluft, for the job. The search committee, however, ranked Wartluft fourth among the four candidates; after the top two candidates declined interviews, the search committee unanimously ranked Wartluft second behind the other candidate. With Carroll's permission, Thein phoned Wartluft and offered her the job of Women's Head Basketball Coach/PE Instructor and she accepted. Controversy over the hiring of the women's basketball coach continued; the search committee was concerned about Wartluft's abilities and that the confidentiality of the committee had been breached. There was concern that Wartluft was not a good fit and would never be accepted by the faculty due to the belief that she was a lesbian. Wartluft was never given a tenure track position.

In late September 2005, Thein received a call from Michelle Henley, the Upward Bound director, concerning inappropriate activities of Upward Bound advisor Jason Munoz.[1] Upward Bound is a Department of Education program designed to assist disadvantaged teenagers in going to college. Henley reported that Jason arrived at the dorm intoxicated and made inappropriate comments to the resident advisor and other students. Jason was found at his home with students who were intoxicated and partially clad. Thein called Carroll and reported the incident to her. Carroll called the district

---

[1] Jason Munoz is the son of Joseph Munoz, a powerful faculty member who was instrumental in creating the hiring policy. Thein had a history of professional disagreements with Joseph Munoz dating back to 2002. To avoid confusion, we refer to Jason Munoz by his first name.

attorney's office and the matter was turned over to the sheriff's office. Thein made the decision to report the incident to the program officer for the federal grants without Carroll's involvement or approval.

In September 2005, Thein proposed hiring a consultant to conduct an external Title IX audit and asked about sources of funding. Abbott told him to find the money in the athletic budget, but Thein believed Abbott and Carroll had money in the college budget for audits and compliance. Because of the dispute over the source of funding for the audit, no audit was conducted.

Thein complained that Munoz was harassing him over the hiring of the women's basketball coach and filed a formal harassment complaint.

In October 2005, FRCC's Board of Trustees determined not to renew Thein's contract.

*Laurel Wartluft*

In the summer of 2004, FRCC's women's head basketball coach left for another position; Wartluft was unanimously hired as an emergency hire. In December, Wartluft volunteered to help FRCC with compliance issues for Title IX. Carroll directed her to perform an investigation about possible recruiting violations by the men's soccer coach. Wartluft authored a report setting forth her findings and a comprehensive compliance plan. As a result, FRCC's soccer program was placed on one-year probation by the Golden Valley Conference. In April 2005, Wartluft confronted Carroll about the failure to institute the compliance plan.

In May 2005, Wartluft applied for the full-time tenure track position of women's head basketball coach. In June, Thein offered her the position and she accepted and began recruiting, although without receiving any funds from FRCC for travel expenses. When she returned in August, Wartluft became upset at the professional expert contract offered her as it was not the position she had accepted. Wartluft asked Carroll what was holding up her contract and said none of the men's coaches would put up with working

4

for two months without a contract and Carroll would not work for months without being paid. Carroll responded, " 'We'll take care of it.' " There was continued confusion about Wartluft's contract and what classes she would teach. She received a check in the amount of $5,600 for "payment," but it was not a regular paycheck with deductions. Wartluft continued to inquire about her employment, but did not receive any response.

In November 2005, Wartluft was told her services were no longer needed and she was asked to turn in her keys.

*Michelle Henley (formerly Michelle Jaureguito)*

In 2000, FRCC hired Henley as the Director of Student Recruiting. Two years later, she was promoted to Talent Search Director. In 2003, Henley was promoted to Upward Bound/Talent Search Director with Thein as her supervisor. Henley supervised Jason Munoz, the Upward Bound advisor.

In the early morning of July 26, 2005, a resident advisor called Henley and told her about Jason's inappropriate actions. Henley, Thein, and the director of dorms went to Jason's home and found Upward Bound students intoxicated and partially clad. They took the students back to the dorms and Thein began an investigation. Abbott took over the investigation and interviewed Jason, who alleged that Henley had provided alcohol to resident advisors and Upward Bound students. When Carroll was told of the incident, Henley advised her that she had a phone message from the director of Plumas County Social Services. Carroll told her not to return the call immediately as Carroll did not want the incident blown out of proportion or to turn into a media circus. The next day, Henley called Abbott to report that a sheriff's sergeant had called her about a report that Jason had taken an underage Upward Bound student on a weekend trip to Sacramento for a leadership conference. Henley checked the records but found no such conference.

Henley also contacted Thein and Carroll about reporting the incident to the program director for the federal grant for Upward Bound. Eventually, Thein and Henley reported the incident without Carroll's involvement or approval. In the meantime,

5

Henley faced disciplinary action based on Jason's allegations about her. Abbott drafted a notice of intention to recommend termination and Carroll notified Henley that she intended to recommend disciplinary action.

On October 26, 2005, Henley filed a retaliation complaint with the Chancellor's Office, claiming that since her report of the Jason incident to law enforcement and Carroll, she had been harassed and retaliated against. Subsequently, Carroll refused to sign documents for grant approvals; instead, she told Henley to finish the information "in a more timely fashion" as she did not like to delegate approvals and would like time to review them. (Henley interpreted such conduct as " 'fr[eezing] her out' " at work.) An investigator found no evidence to support Henley's retaliation claim. In the spring of 2006, Henley resigned. The disciplinary action against her was still pending.

*The Whistleblower Complaints*

Thein, Wartluft, and Henley filed whistleblower retaliation complaints pursuant to Government Code sections 8547 through 8547.12 and 19683, and the Act. Thein alleged he was retaliated against and ultimately fired as a result of his voiced concerns that: (1) FRCC was not in compliance with Title IX of the Educational Amendments of 1972; (2) FRCC discriminated against female employees; and (3) FRCC did not adequately respond to the inappropriate and unlawful sexual misconduct of Jason, the son of an influential faculty leader.

In an amended complaint, Wartluft alleged she was forced "to run a gauntlet of retaliation and hostility" because: (1) she was outspoken in her protests that FRCC was not in compliance with Title IX; (2) she was viewed as allied with Thein in his efforts to eliminate unlawful activities at FRCC; and (3) she was stereotyped and discriminated against based on her perceived sexual orientation. Further, FRCC refused to pay her for months and never paid her the promised compensation. Finally, she was humiliated by being fired without notice the day before the start of the women's basketball season.

6

Henley alleged she was retaliated against and forced to quit her job as a result of her voiced concerns that: (1) Jason had sexually harassed and provided alcohol to minor female students at campus housing; and (2) FRCC did not adequately respond to inappropriate and unlawful sexual misconduct and sexual harassment of employees and students.

*The ALJ Decision*

After a hearing over 14 days, the ALJ ordered that Thein, Wartluft, and Henley be reinstated; all documents in their personnel files relating to the complaints be expunged; and they be given back pay and benefits.

*The SPB Decision*

The SPB rejected the ALJ's proposed decision. The SPB found that plaintiffs failed to demonstrate that they made disclosures protected by the Act. Noting that the Act did not explicitly state whether communications made in the course of employment are protected, the SPB looked to federal law interpreting the Federal Whistleblower Act of 1989, after which the Act was modeled. Specifically, the SPB cited to *Huffman v. Office of Personnel Management* (Fed.Cir. 2001) 263 F.3d 1341 (*Huffman*). It found that protected disclosures were those made to one who was in a position to correct the wrongdoing "whereby the employee risks [his] own personal job security for the benefit of the public." The three whistleblower retaliation complaints were dismissed.

*Findings as to Thein*

The SPB found none of Thein's four alleged communications were protected disclosures. Thein's first alleged protected disclosure was his communication to Carroll that not hiring Wartluft as a full-time tenure track head women's basketball coach placed FRCC in serious noncompliance with Title IX which could trigger an audit and jeopardize federal funding. The SPB found this communication was not protected because Thein was responsible for obtaining federal monies and ensuring compliance

7

with Title IX, so the communication was within his normal duties and he did not go outside the normal channels in reporting.

The SPB found Thein's report to Carroll about the Jason incident was not protected because it was within the normal course of his duties and he did not go outside normal channels.

According to the SPB, Thein's communication recommending the hiring of an outside consultant to determine FRCC's compliance with Title IX was not a protected disclosure. It was part of his normal duties and the disagreement centered mainly on funding issues, a work dispute about from where the money should come.

The SPB found Thein's fourth communication about Munoz interfering with his duties was not a protected disclosure. The complaint was within his job duties and was simply part of a continuing work place discord with a colleague.

*Findings as to Wartluft*

The SPB found Wartluft alleged three protected disclosures, but none of them was protected. Wartluft's report of April 14 that FRCC was not in compliance with Title IX was not protected because reporting Title IX deficiencies was "precisely the task she was charged to do." The SPB found her reports in September and October that she was not being paid were not revelations of improper governmental activity, but only an ongoing effort to resolve a contract dispute.

*Findings as to Henley*

The SPB found Henley's report of the Jason incident was not a protected disclosure because she was acting in her role as Director of Upward Bound/Talent Search and reported through normal channels. Her retaliation complaint to the Chancellor's Office was not protected because it was not a new allegation, but "one and the same" as her previous report.

8

*Writ Petition*

Plaintiffs petitioned for a writ of administrative mandamus, alleging the SPB decision was invalid. They alleged it was a prejudicial abuse of discretion to find Wartluft's report of working without pay was not a revelation of an improper governmental activity. Further, it was a prejudicial abuse of discretion to find Henley's reports were part of her assigned tasks. Finally, the petition alleged the SPB made erroneous legal findings as to what constituted a protected disclosure. The petition requested reinstatement, back pay with interest, and expungement of documentation relating to the retaliation complaints.

FRCC demurred, contending the petition was barred by the statute of limitations and laches, among other things. The trial court overruled the demurrer, finding the one-year statute of limitations of Government Code section 19630 applied and rejecting the claim of laches.

The court granted the petition. It found the SPB made legal errors in determining what constituted a protected disclosure. First, the SPB failed to distinguish among the three different types of communications in the normal course of duties as set forth in *Huffman*. Second, the SPB erred in finding that a disclosure was not protected unless made to one in a position to correct the wrongdoing and the employee risked his job security for the benefit of the public. The court found these legal errors materially affected the SPB's determination as to all three plaintiffs. Further, it found the challenge to the factual findings as to Henley moot and that Wartluft's disclosure about her lack of pay was a disclosure of a violation of state law. While FRCC contended this was a disclosure of known facts, there was no such finding in the SPB decision and the court would not supply a missing finding.

9

I

*Standard of Review of SPB Decision*

We stand in the same shoes as the trial court in reviewing a decision of the SPB on a petition for administrative mandamus. (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632.) Code of Civil Procedure section 1094.5 sets forth the procedure for judicial review of an order or a decision by an administrative agency. (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 137.) "The inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b).)

"[I]mplicit in section 1094.5 is a requirement that the agency which renders the challenged decision must set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order. . . . By focusing . . . upon the relationships between evidence and findings and between findings and ultimate action, the Legislature sought to direct the reviewing court's attention to the analytic route the administrative agency traveled from evidence to action. In so doing, we believe that the Legislature must have contemplated that the agency would reveal this route." (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515.) "Among other functions, a findings requirement serves to conduce the administrative body to draw legally relevant sub-conclusions supportive of its ultimate decision; the intended effect is to facilitate orderly analysis and minimize the likelihood that the agency will randomly leap from evidence to conclusions. [Citations.] In addition, findings enable the reviewing court to trace and examine the agency's mode of analysis. [Citations.]" (*Id*. at p. 516, fn. omitted.)

A court cannot cure an agency's inadequate findings by supplying its own findings.  (*American Funeral Concepts v. Board of Funeral Directors & Embalmers* (1982) 136 Cal.App.3d 303, 311 (*American Funeral*).)  "To permit such a post hoc cure would make unattainable the goals of findings elaborated in *Topanga, supra*, 11 Cal.3d 506." (*American Funeral, supra,* at p. 311.)  Instead, the appropriate remedy is to "remand the case to the agency to prepare adequate findings, to take additional evidence, or both."  (1 *California Administrative Mandamus* (Cont.Ed.Bar 3d ed. 2012 Update) § 6.168, p. 297.)

II

*"Protected Disclosure" under the Act*

A.  *The Act*

The Act was "intended to extend 'whistleblower' protections of the California Whistleblower Protection Act (Gov. Code, § 8547 et seq.; California WPA) that apply to state employees, to public school and community college employees.  [Citation.]  The California WPA, in turn, was 'intended to align state "whistleblower" statutes with those in existing federal law.'  [Citation.]" (*Mize-Kurzman v. Marin Community College Dist*. (2012) 202 Cal.App.4th 832, 847 (*Mize-Kurzman*).

The Act prohibits reprisal or retaliation against a public school employee, including a community college employee, for making a protected disclosure.  (Ed. Code, §§ 87163-87164.)  A " '[p]rotected disclosure' means a good faith communication that discloses or demonstrates an intent to disclose information that may evidence either the following:  [¶]  (1) An improper governmental activity.  [¶]  (2) Any condition that may significantly threaten the health or safety of employees or the public if the disclosure or intention to disclose was made for the purpose of remedying that condition."  (Ed. Code, § 87162, subd. (e).)  An " '[i]mproper governmental activity' means an activity by a community college or by an employee that is undertaken in the performance of the employee's official duties, whether or not that activity is within the scope of his or her

11

employment, and that meets either of the following descriptions: [¶] (1) The activity violates a state or federal law or regulation, including, but not limited to, corruption, malfeasance, bribery, theft of government property, fraudulent claims, fraud, coercion, conversion, malicious prosecution, misuse of government property, or willful omission to perform duty. [¶] (2) The activity is economically wasteful or involves gross misconduct, incompetency, or inefficiency." (Ed. Code, § 87162, subd. (c).)

B. *Interpreting the Act:* Mize-Kurzman *and* Huffman

Although the language of the Federal Whistleblower Protection Act (see 5 U.S.C. § 2302) is not the same as that of the Act, "the language and purpose of the statutes are sufficiently close to permit the court to use federal authorities as a guide to interpretation" of the Act. (*Mize-Kurzman, supra,* 202 Cal.App.4th at pp. 848-849.) Recognizing the dearth of California law on the subject, the *Mize-Kurzman* court found it appropriate to instruct the jury in accord with federal case law "further defining (and limiting) the disclosures" protected as whistleblowing. (*Id.* at p. 849.)

One of the jury instructions at issue in *Mize-Kurzman* told the jury that information passed along to a supervisor in the normal course of duties is not a protected disclosure. The appellate court found this instruction erroneous under both federal and California law. (*Mize-Kurzman, supra,* 202 Cal.App.4th at p. 856.) The instruction appeared to have been based on *Huffman, supra,* 263 F.3d 1341, which stated an employee who makes disclosures as part of his normal duties is not protected by the federal WPA. (*Id.* at pp. 1351-1352.) Here, the SPB relied on this "normal duties" exception in finding many of the alleged disclosures here were not protected disclosures under the Act.

In clarifying the "normal duties" issue, the *Huffman* court distinguished between three "quite different" situations. (*Huffman, supra,* 263 F.3d at p. 1352.) "*First*, there is the situation in which the employee has, as part of his normal duties, *been assigned the task of investigating and reporting wrongdoing* by government employees and, in fact,

12

reports that wrongdoing through normal channels." (*Ibid*., first italics in original, second italics added.) The "quintessential example" of this situation is a law enforcement officer whose duties include investigation of crime by government employees and reporting the results of his investigation to his supervisor. (*Ibid*.) An employee in an inspector general's office (the employee at issue) may be in a similar position. (*Ibid*.) Because this type of reporting does not implicate the core purposes of the federal WPA, it is not a protected disclosure. (*Ibid*.) "*Second*, there is the situation in which an employee *with such assigned investigatory responsibilities* reports the wrongdoing outside of normal channels." (*Id*. at p. 1354, first italics in original, second italics added.) "*Third*, there is the situation in which the employee is obligated to report the wrongdoing, but such a report is not part of the employee's normal duties or the employee has not been assigned those duties." (*Ibid*.) Both of these latter two situations present protected disclosures. (*Ibid*.) "A report may be a disclosure protected by the Act, though the employee can also be disciplined for failure to make the report." (*Ibid.*) The *Huffman* court remanded the matter to the Merit Systems Protection Board to consider under which category the reports at issue fell. (*Id*. at pp. 1354-1355.)

The *Huffman* court also held that reports need not be made to those with authority to correct the wrongdoing in order to be protected. (*Huffman, supra,* 263 F.3d at p. 1351.) "Any government employee, in a supervisory position, other than the wrongdoer himself, is in a position to 'correct' or 'remedy' the abuse by bringing the matter to the attention of a higher authority. To be consistent with the statute and its purposes, complaints to supervisors concerning wrongdoing by other employees or other matters within the scope of the WPA should be encouraged and not discouraged, even if the supervisor himself lacks authority to directly correct the wrongdoing." (*Ibid*.)

After discussing *Huffman*, the *Mize-Kurzman* court then turned to California law. It found that under Labor Code section 1102.5, a whistleblower protection statute at issue there but not in this case, a report to one's employer, even when one "was simply doing

13

her job," was entitled to protection. (*Mize-Kurzman, supra,* 202 Cal.App.4th at pp. 856-858.) The court concluded that it was error to instruct "that information passed along to a supervisor in the normal course of duties was *not* a protected disclosure under California law." (*Id.* at p. 858.) The court concluded, "[I]t cannot categorically be stated that a report to a supervisor in the normal course of duties is not a protected disclosure." (*Ibid*.) The *Mize-Kurzman* court did not address or decide in what respects, if any, California law differs from federal law as to when a report made as part of an employee's normal duties qualifies as a protected disclosure.

Another jury instruction at issue in *Mize-Kurzman* told the jury that the disclosure must be made in good faith and for the public good and not for personal reasons. (*Mize-Kurzman, supra,* 202 Cal.App.4th at p. 850.) The court found this instruction misstated the law as the whistleblower's motivation was irrelevant. (*Ibid*.) " 'As long as the employee can voice a reasonable suspicion that a violation of a constitutional, statutory, or regulatory provision has occurred, the employee's report to a government agency may be sufficient to create liability for the employer for retaliation.' [Citation.]" (*Ibid*.)

C. *Recent Amendments*

The federal WPA was recently amended to clarify that a disclosure is not unprotected because, *inter alia*, (1) it is made to a supervisor or an alleged wrongdoer; (2) it revealed information previously disclosed; or (3) it is made in the normal course of the employee's duties and the employee suffered reprisal for the disclosure.[2] (5 U.S.C. § 2302, subd. (f)(1)(A) & (B) & (f)(2); Pub. Law 112-199, 126 Stat. 1465 (2012).) Plaintiffs contend these recent amendments show that the federal circuit court interpreted

---

[2] The California Whistleblower Protection Act (Gov. Code, §§ 8547-8547.13) was amended in 2009 to state that a "protected disclosure" includes "a communication based on, or when carrying out, job duties." (Gov. Code, § 8547.2, subd. (e), as amended by Stats. 2009, ch. 452, § 5.)

14

the federal WPA too narrowly, and thus the SPB did the same in interpreting the Act. *Huffman* stands as the narrowest interpretation of what constitutes a protected disclosure and we interpret it strictly in accordance with its language. Because, as we discuss *post*, we find the SPB erroneously applied *Huffman* to the facts of this case, and the record does not establish that any of the plaintiffs' disclosures fell within *Huffman's* first category, we need not decide whether the recent amendments to the federal law are retroactive and thus abrogate *Huffman*.[3] For the same reason, it is not necessary to decide whether recent amendments to the California WPA should be applied retroactively to this case.

III

*Analysis of the SPB's Findings of No Protected Disclosure*

The SPB found all of the alleged disclosures were not "protected disclosures." Because the SPB made this finding, it did not consider whether plaintiffs established other elements of their complaints. We consider each disclosure in turn to determine whether the SPB correctly applied the law in determining it was not a protected disclosure.

A. *Thein's Disclosures*

1. Thein's First Communication

The SPB found Thein's disclosure that not hiring Wartluft as a full-time tenure track coach would violate Title IX was not a protected disclosure because Thein, as athletic director, was "largely responsible for attaining federal monies an ensuring that the Athletic program was in compliance with Title IX" and therefore his disclosure fell

---

[3] The issue of the retroactivity of the recent amendments to the federal whistleblower law is currently pending in federal court before the D.C. and Ninth Circuits. See *Amos v. District of Columbia*, No. 12–7119 (D.C.Cir. docketed Nov. 13, 2012); *Kerr v. Salazar*, No. 12–35084 (9th Cir. argued May 22, 2013). (*Murphy v. U.S. Dept. of Veterans Affairs* (D.Me., 2013) 2013 WL 4508346, *5, fn. 7.)

15

within his normal duties. Since he did not report the problem to the board of directors or the media, the SPB found that he did not go outside normal channels or make the report to one in a position to remedy it. Implicitly, the SPB found Thein's disclosure fell within the first *Huffman* category. The SPB further found that Thein made his report to the purported wrongdoer. The SPB's factual findings, however, do not support this decision.

While the SPB found that Thein's "normal duties" included compliance with Title IX, the SPB did not find that Thein had "*been assigned the task of investigating and reporting wrongdoing* by government employees." (*Huffman, supra,* 263 F.3d at p. 1352, emphasis added.) The SPB did not find, for example, that Thein was the Title IX compliance officer or investigator for FRCC; Wartluft testified that Abbott was in charge of all compliance at the college. Thein's position as athletic director was not analogous to a police officer assigned to investigate and report wrongdoing by government employees, the "quintessential example" of *Huffman's* first category. (*Huffman, supra,* at p. 1352.) Nor was Thein's position comparable to those whose disclosures federal courts have found to be within the normal course of their duties. (See *Mason v. Merit Systems Protection Bd.* (Fed.Cir. 2013) 496 Fed.Appx. 75, 79 [disclosures of finance-related violations by financial specialist not protected when he was instructed to report anomalies and to raise questions about travel vouchers when red flags appeared]; *Layton v. Merit Systems Protection Bd.* (Fed.Cir. 2009) 392 Fed.Appx. 875, 880 [employee who reported results after being ordered to perform audit acted within his normal job duties]; *Kahn v. DOJ* (Fed.Cir. 2008) 618 F.3d 1306, 1314 [report by special agent criminal investigator of ongoing investigation was within normal job duties]; *Mestan v. International Boundary and Water Com'n* (Fed.Cir. 2004) 95 Fed.Appx. 1012, 1015 [disclosure of waste of electrical energy by employee who managed environmental investigation was not protected].)

In finding that Thein's disclosure was not protected, the SPB misapplied *Huffman*, even though it correctly set forth *Huffman's* three categories. The SPB erred in focusing

16

solely on whether Thein was expected to make such a disclosure because it related to an area within his normal duties. In finding the disclosure was part of Thein's "normal duties," the SPB failed to find that Thein had been assigned to investigate and report wrongdoing, an explicit requirement of *Huffman's* first category. (*Huffman, supra,* 263 F.3d at p. 1352.) Under *Huffman's* third category, an employee who is "obligated to report the wrongdoing, but such a report is not part of the employee's normal duties or the employee has not been assigned those duties" makes a protected disclosure. (*Id.* at p. 1354.) Further, the SPB erred in finding the report had to be made to one in a supervisorial position to remedy the wrongdoing. (*Id.* at p. 1351.)

Finally, in summarizing its reasons why Thein's disclosure was not protected, the SPB added a new reason, that it was made to the purported wrongdoer, Carroll. The SPB's factual findings, however, indicate Thein made this disclosure to others as well as Carroll. He sent Abbott a copy of his e-mail to Carroll and he raised his Title IX concerns about the women's basketball coach to the chairwoman of the hiring committee.

### 2. Thein's Second Communication

The SPB's finding that Thein's second disclosure (Jason's misconduct) did not constitute a protected disclosure suffers from the same error. The SPB found that since Thein oversaw the TRIO Program, under which the Upward Bound Program fell, it was his responsibility to tell the president of any problems and he did not go outside normal channels. Again, there was no finding that Thein had been assigned the task of investigating and reporting problems in the Upward Bound Program, so the SPB failed to make the findings necessary to include Thein in *Huffman's* first category. That Thein was obligated to report problems in a program he oversaw did not render the report unprotected. (*Huffman, supra,* 263 F.3d at p. 1354.) The SPB's factual findings do not support its decision that Thein's second communication was not a protected disclosure under the Act.

17

### 3. Thein's Third Communication

Thein's third alleged disclosure was recommending the hiring of an outside consultant to determine if FRCC was in compliance with Title IX. Again, the SPB found this disclosure was part of his job duties, but also found that the dispute centered not on the need or appropriateness of the audit, but on where the money to pay for the audit should come from--the budget for athletics or from the college's budget. A protected disclosure means a good faith communication that discloses or demonstrates an intent to disclose information that may evidence either a violation of a state or federal law or regulation or a condition that may significantly threaten the health or safety of employees. (Ed. Code, § 87162, subds. (c) & (e).) We agree with the SPB that a workplace dispute over the source of funds for an external audit does not qualify as a protected disclosure.

### 4. Thein's Fourth Communication

Thein's fourth alleged communication encompassed his complaints to Carroll that Munoz was interfering with his duties by attempting to derail the hiring of Wartluft. The SPB noted that Thein and Munoz had "an ongoing and contentious struggle" dating to 2002 and workplace discord with a colleague was not a protected disclosure. The SPB found that Thein failed to demonstrate a protected disclosure because "his communications were in the normal scope of his duties and he did not report the issues to an authority in a position to remedy the alleged wrong and did not go outside the normal channels and beyond his typical job duties." But a protected disclosure need not be made to one who can remedy the wrongdoing. (*Huffman, supra,* 263 F.3d at p. 1351.) Further, the SPB's findings to support the "normal duties" exception under *Huffman* are flawed for the reasons set forth *ante.* We recognize there might be other reasons that this communication does not qualify as a protected disclosure, but we cannot supply findings the SPB did not make. (*American Funeral, supra,* 136 Cal.App.3d at p. 311.)

18

B.. *Wartluft's Disclosures*

               1.  Reports of Noncompliance with Title IX

The SPB found Wartluft's alleged protected disclosures fell into two categories. First, there were her reports from January through May that FRCC was not in compliance with Title IX, including raising the issue of fundraising inequities at an April 14, 2005, meeting and confronting Carroll on April 15 about her press release claiming a compliance plan when the college did not have one. The SPB found these communications were not protected because Wartluft "simply performed duties that she was not only directed to perform but volunteered for."

The SPB cited Wartluft's expertise in gender equity which both Carroll and Thein utilized. Wartluft assisted Thein with Title IX reports and attended meetings on Title IX compliance issues. She raised the issue of fundraising efforts by the men's coaches. Carroll assigned Wartluft the task of investigating recruiting violations by the men's soccer team; she found a violation which resulted in the soccer program being placed on probation for a year. While Wartluft was certainly well involved in issues of Title IX compliance at FRCC, the only finding that she was assigned the task of investigating and reporting wrongdoing was her investigation of recruiting by the men's soccer program. Her report resulted in the soccer team being placed on probation. Wartluft does not allege that any report related to those recruiting problems was a protected disclosure.

The SPB did not make a finding that Wartluft was generally assigned the task to investigate and report Title IX compliance issues, the finding necessary for inclusion in the first *Huffman* category. To the extent that the SPB's finding that Wartluft's reports arose from duties she was directed to perform could be read to supply that finding, such a reading is not supported by substantial evidence. There was considerable evidence of Wartluft's expertise in Title IX matters, that Thein welcomed her expertise and sent her to meetings discussing issues of compliance with Title IX, and that Wartluft raised issues of noncompliance. That Wartluft undertook to report what she believed were Title IX

19

noncompliance issues does not establish that she was *assigned to investigate and report* noncompliance with Title IX. The SPB's factual findings do not support its conclusion of no protected disclosure.

### 2. Complaints of No Pay

The second category of Wartluft's disclosures consisted of her complaints that she had not been paid and that none of the men's coaches, or Carroll, would have had to endure such a situation. The SPB found these communications were not protected disclosures; instead, they "were an ongoing effort to resolve a contractual dispute."

A protected disclosure means a good faith communication that discloses information that may evidence a violation of a state or federal law or regulation. (Ed. Code, § 87162, subds. (c) & (e).) An employee need only have a reasonable suspicion of a violation of law. (*Mize-Kurzman, supra,* 202 Cal.App.4th at p. 850.) Wartluft's complaint that she was not paid meets this standard as it is illegal not to pay employees. (See, e.g., Lab. Code, § 204, subd. (a); Educ. Code §§ 87821, 88165.) FRCC argues that Wartluft could not rely on these statutes because Labor Code section 204 does not apply to community college employees and she has failed to show she attained the status of an employee under the provisions of the Education Code. FRCC's argument misses the point. To make a protected disclosure, Wartluft did not have to establish the statutory basis entitling her to pay for work performed, she only had to have a reasonable suspicion that the law was violated. (*Mize-Kurzman, supra,* at p. 850.)

FRCC argues Wartluft's disclosures about the failure to pay her were not protected disclosures because they were made to the wrongdoer and they contained information already known to the college. The SPB, however, did not make findings on these points. We will not supply the missing findings. (*American Funeral, supra,* 136 Cal.App.3d at p. 311.)

20

C. Henley's Disclosures

The SPB found Henley alleged two protected disclosures. In July 2005, Henley informed Thein, and later Abbott and Carroll about Jason's misconduct involving alcohol and possible sexual misconduct with minors. In October 2005, Henley filed a complaint of harassment and retaliation with the Chancellor's Office after Carroll failed to communicate with Henley about work-related matters. The SPB found Henley's disclosures were "consistent with her role as Director [of Upward Bound/Talent Search] in that she was reporting wrongdoing by government employees through normal channels." The SPB found the second communication was "one and the same" as the first; it was not a new allegation.

The SPB's "normal duties" analysis--that Henley was simply doing her job in making the report--suffers from the same flaw as the similar findings with respect to Thein and Wartluft. The SPB made no finding that Henley was generally assigned the task to investigate and report wrongdoing in the Upward Bound program. That, in her position as director, Henley was obligated to report any wrongdoing in the program does not mean her disclosure was not protected. (*Huffman, supra,* 263 F.3d at p. 1354.) Again, the SPB's factual findings do not support its finding of no protected disclosures.

IV

*Statute of Limitations*

FRCC contends, as it did unsuccessfully on demurrer in the trial court, that plaintiffs' petition was barred by the 30-day statute of limitations of Government Code section 11523.[4] That section is contained in Chapter 5 (Gov. Code, §§ 11500-11529) of

---

[4] That section provides in part: "Judicial review may be had by filing a petition for a writ of mandate in accordance with the provisions of the Code of Civil Procedure, subject, however, to the statutes relating to the particular agency. Except as otherwise provided in this section, the petition shall be filed within 30 days after the last day on which reconsideration can be ordered."

21

the Administrative Procedure Act (APA). Chapter 5 of the APA is generally inapplicable to the SPB. (*California Youth Authority v. State Personnel Bd.* (2002) 104 Cal.App.4th 575, 589.) A specific statute governs over the more general statute of limitations of the APA. (*Capitol Racing, LLC v. California Horse Racing Bd.* (2008) 161 Cal.App.4th 892, 902.) There is a more specific statute of limitations governing review of SPB decisions.

The SPB is a statewide administrative agency to which the California Constitution grants adjudicatory power to review disciplinary actions taken against state civil service employees. (Cal. Const., art. VII, § 3; *Department of Parks & Recreation v. State Personnel Bd.* (1991) 233 Cal.App.3d 813, 823.) Government Code section 19630 (Stats. 1988, ch. 251, § 1) establishes a one-year statute of limitations for challenging civil service rulings. It provides in relevant part: "No action or proceeding shall be brought by any person having or claiming to have a cause of action or complaint or ground for issuance of any complaint or legal remedy for wrongs or grievances based on or related to any civil service law in this state, or the administration therefore, unless that action or proceeding is commenced and served within one year after the cause of action or complaint or ground for issuance of any writ or legal remedy first arose. . . . Where an appeal is taken from a decision of the board, the cause of action does not arise until the final decision of the board." This statute "establishes a one-year statute of limitations on lawsuits seeking review of State Personnel Board decisions." (*Ng v. State Personnel Bd.* (1977) 68 Cal.App.3d 600, 606-607; see also *Sinclair v. Baker* (1963) 219 Cal.App.2d 817, 821.)

The SPB's decision was served on October 26, 2010. Under the regulations in effect at that time, it became final 30 days later. (Cal. Code Regs., tit. 2, § 51.6, Register 2003, No. 14 (Apr. 4, 2003).) Plaintiffs' petition was filed within one year, on October 19, 2011. The petition was timely.

V

*Laches*

FRCC contends plaintiffs' writ petition is barred by laches because they did not seek reconsideration of the SPB decision and they delayed filing the writ petition for 12 months. Instead of immediately challenging the SPB decision, plaintiffs proceeded with their pending federal complaints. It was only after the federal court granted FRCC's motion for summary judgment that plaintiffs petitioned for a writ of mandamus. FRCC contends plaintiffs acquiesced in the SPB decision and the delay prejudiced it and the judicial system.

A. *Background*

After plaintiffs filed their whistleblower retaliation complaints with the SPB, they each filed a complaint in federal court. These complaints alleged unlawful retaliation and discrimination in violation of Title IX and retaliation in violation of the California Fair Employment and Housing Act (FEHA). In addition, Thein and Henley alleged failure to prevent discrimination and harassment in violation of FEHA. Wartluft alleged sexual orientation discrimination and gender discrimination in violation of FEHA and failure to pay compensation at the time of termination in violation of the California Labor Code. After the SPB rendered its decision dismissing plaintiffs' complaints, FRCC moved for summary judgment on the basis that plaintiffs' Title IX and FEHA claims were precluded by the SPB decision. Although plaintiffs argued the SPB decision was not final, the federal court found the "as yet unreviewed SPB action is a final decision for purposes of this court's exercise of jurisdiction." The federal court granted the summary judgment motion in part as to plaintiffs' claims of unlawful retaliation in violation of Title IX and FEHA. The court declined to exercise supplemental jurisdiction over the remaining state law claims and dismissed them with leave to refile in state court. Shortly after the judgments were entered in federal court, plaintiffs petitioned for a writ of administrative mandamus.

23

B.  *The Law and Analysis*

" 'Laches is an implied waiver resulting from knowing acquiescence in existing conditions and an inexcusable delay in asserting a right which results in prejudice to the adverse party.  [Citation.]'  [Citation.]" (*Marriage v. Keener* (1994) 26 Cal.App.4th 186, 191.)  "The defense of laches requires unreasonable delay plus either acquiescence in the act about which plaintiff complains or prejudice to the defendant resulting from the delay." (*Conti v. Board of Civil Service Comm's* (1969) 1 Cal.3d 351, 359, fns. omitted.)  Acquiescence is shown when plaintiff accepts the benefits of the act about which she later complains.  (*In re Marriage of Burkle* (2006) 139 Cal.App.4th 712, 753.)  "To show prejudice for the purpose of laches the party asserting the defense must show he did or omitted to do something which detrimentally altered his position *with respect to the claim or right asserted.*" (*In re Marriage of Nicolaides* (1974) 39 Cal.App.3d 192, 203.)

"Prejudice is never presumed; rather it must be affirmatively demonstrated by the defendant in order to sustain his burdens of proof and the production of evidence on the issue.  [Citation.]  Generally speaking, the existence of laches is a question of fact to be determined by the trial court in light of all of the applicable circumstances, and in the absence of manifest injustice or a lack of substantial support in the evidence its determination will be sustained.  [Citations.]" (*Miller v. Eisenhower Medical Center* (1980) 27 Cal.3d 614, 624.)  Here, the trial court found the facts and circumstances failed to establish that plaintiffs acquiesced in the SPB decision or that FRCC suffered a material change in the status quo due to the delay.

As the trial court found in overruling FRCC's demurrer, FRCC has failed to show either prejudice or acquiescence.  The parties remain in the same position; FRCC has not shown that it altered its position to its detriment due to the delay in filing the writ petition.  Further, the plaintiffs never acquiesced in the SPB decision.  They argued in federal court that it was not final, and when the federal court found the SPB decision had

24

preclusive effect barring the federal lawsuit, plaintiffs challenged the SPB decision in state court.  The trial court properly found the writ petition was not barred by laches.

## DISPOSITION

The judgment and accompanying writ of mandate are affirmed.  Plaintiffs shall recover costs on appeal.  (Cal. Rules of Court, rule 8.278 (a)(1) & (2).)


           DUARTE         , J.


We concur:


     NICHOLSON     , Acting P. J.


     HOCH          , J.